L. J. SEYBOLD, Appellant, v. FRED EISLE, Appellee.

Master and servant: TORTS OF SERVANT: LIABILITY OF MASTER: EVI-
DENCE. The master is liable for the wrongful acts of his servant
when done in the course of his employment and in furtherance
of the work expressly intrusted to him, even though done in vio-
lation of the positive instruction of the master; and the question
of whether the wrongful acts were committed while the servant
was acting within the scope of his employment is generally for
the jury. In this case defendant's servants while plowing set
fire to weeds and grass standing in the field and the fire spread
to plaintiff's field, destroying his property. *Held,* that the evi-
dence was sufficient to take the question whether in setting the
fire they were acting in furtherance of the employment to the
jury.

*Appeal from Monona District Court.*—HON. WM. HUTCH-
INSON, Judge.

WEDNESDAY, FEBRUARY 14, 1912.

ACTION at law to recover damages caused by a fire set out by defendant's agents. Trial to a jury, directed ver-
dict for defendant, and plaintiff appeals.—*Reversed* and *remanded.*

*Miles W. Newby,* for appellant.

*J. W. Anderson,* for appellee.

DEEMER, J.—In the latter part of September of the year 1909 defendant entered into a contract with one Craven to do some plowing for the latter upon his farm in Monona county. The plowing was to be done with a gasoline engine plow, and for so much per acre. To assist in running the plow and engine, defendant employed two men, one named Butcher and the other Nelson. These men were given charge of the engine and plow, and directed to do the work. The field in which they were to work was covered with tall grass and weeds which had grown up because of lack of cultivation during previous years, and the subject of burning this grass came up between defendant and Craven the day the men were set to work. The exact nature of the conversation had at this time we shall refer to later. After this talk, several furrows were plowed on the south side of the field as a fireguard. The men employed by defendant were left in charge of the engine and plow, and they proceeded with the plowing for a day or two, when the man in charge of the engine, to wit, Butcher, for some purpose not made clear from the testimony, stopped the machine, went a short distance from it, and set fire to the grass and weeds, near the south side and west end of the field, ran the engine to the north of the fire, left it, and he, with his companion, went to a nearby town. There was a high wind blowing from the northwest, and this carried the fire to the south and east, where it escaped from the field which was being plowed, passed on to plaintiff's land, and finally set fire to some stacks of hay, which were totally destroyed. This action was brought to recover damages for the destruction of the hay. After all the testimony was adduced, the trial court, upon motion, directed a verdict for defendant, and plaintiff appeals.

It is admitted that defendant was an independent con-

tractor, and that Craven, the owner of the land, is not responsible for the damages done. It is also conceded that the man who set out the fire and the men in charge of the engine and plow were defendant's agents and servants, and that these agents and servants were negligent in setting out the fire, or that a jury would have been warranted in finding them negligent. It is also admitted that there is no testimony showing that defendant expressly directed his servants to set out the fire. It is apparent, then, that the only question in the case is this, Was there enough testimony to take the case to the jury upon the theory that these servants had implied authority to set out the fire, or that the setting out of the fire was fairly within the scope of their employment?

The general rule with reference to the liability of the master for the acts of his servant is well understood, but its application to concrete cases has been difficult. The general rule as stated in *Lewis v. Schultz,* 98 Iowa, 341, is as follows: "If the servant was acting in the course of his employment in clearing up and leveling off the meadow, and while so doing committed the wrong complained of, the master is liable, although the servant may have disobeyed the master's instructions with reference to setting out fire. It is sufficient to make the master responsible if the wrongful act of the servant was committed in the business of the master, and within the scope of his employment, and this, although the servant in doing it departed from the instructions of his master (Mechem, Agency, section 734) ; or, as stated by Judge Cooley in his work on Torts (2d ed.), 63: 'It is, in general, sufficient to make the master responsible that he gave to the servant an authority, or made it his duty, to act in respect to the business in which he was engaged when the wrong was committed, and that the act complained of was done in the course of his employment.'" Again, in *Healy v. Johnson,* 127 Iowa, 226, we said: "The doctrine of *respondeat su-*

*perior* is not limited to the acts of the servant done with the express or implied authority of the master, but extends to all acts of the servant done in discharge of the business intrusted to him, even though done in violation of his instructions. See authorities collected in 20 Am. & Eng. Enc. of Law (2d ed.), 167." In *Morier v. St. Paul R. R.,* 31 Minn. 351 (17 N. W. 952, 47 Am. Rep. 793), the court of that state announced the rule as follows: "Beyond the scope of his employment, the servant is as much a stranger to his master as any third person. The master is only responsible so long as the servant can be said to be doing the act, in the doing of which he is guilty of negligence, in the course of his employment. A master is not responsible for any act or omission of his servant which is not connected with the business in which he serves him, and does not happen in the course of his employment; and, in determining whether a particular act is done in the course of the servant's employment, it is proper first to inquire whether the servant was at the time engaged in serving his master. If the act be done while the servant is at liberty from the service, and pursuing his own ends exclusively, the master is not responsible. If the servant was at the time when the injury was inflicted acting for himself, and his own master *pro tempore,* the master is not liable. If the servant step aside from his master's business, for however short a time, to do an act not connected with such business, the relation of master and servant is for the time suspended. Such, variously expressed, is the uniform doctrine laid down by all authorities." In *Turberville v. Stamp,* Lord Raym. 264 (1 Salk. 13), the defendant's servants so negligently kept a fire lighted in his field that it extended to and consumed the heath of the plaintiff. The defendant was held liable to an action for the injury, and Lord Holt observed: "If the defendant's servant kindled the fire in the way of husbandry and proper for his employment, though he had no express com-

mand of his master, yet his master shall be liable to an action for damage done to another by the fire, for it shall be intended that the servant had authority from his master; it being for his master's benefit.

In *Philadelphia & R. R. R. Co. v. Derby,* 14 How. 468 (14 L. Ed. 502), the Supreme Court of the United States said:

The rule of *'respondeat superior,'* or that the master shall be civilly liable for the tortious acts of his servant, is of universal application, whether the act be one of omission or commission, whether negligent, fraudulent, or deceitful. If it be done in the course of his employment, the master is liable; and it makes no difference that the master did not authorize, or even know of the servant's act or neglect, or even if he disapproved or forbade it, he is equally liable, if the act be done in the course of his servant's employment. See Story on Agency, section 452; Smith on Master and Servant, 152. There may be found in some of the numerous cases reported on this subject, *dicta* which, when severed from the context, might seem to countenance the doctrine that the master is not liable if the act of his servant was in disobedience of his orders. But a more careful examination will show that they depended on the question whether the servant at the time he did the act complained of was acting in the course of his employment; or, in other words, whether he was or was not at the time in the relation of servant to the defendant. The case of *Sleath v. Wilson,* 9 Carr & P. 607, states the law in such cases distinctly and correctly. In that case a servant, having his master's carriage and horses in his possession and control, was directed to take them to a certain place; but, intead of doing so, he went in another direction to deliver a parcel of his own, and, returning, drove against an old woman and injured her. Here the master was held liable for the act of the servant, though at the time he committed the offense he was acting in disregard of his master's orders, because the master had intrusted the carriage to his control and care, and in driving it he was acting in the course of his employment. Mr. Justice Erskine remarks in this case: 'It is quite clear that if a servant, without his master's knowledge, takes

his master's carriage out of the coach house, and with it commits an injury, the master is not answerable, and on this ground that the master has not intrusted the servant with the carriage; but, whenever the master has intrusted the servant with the control of the carriage, it is no answer that the servant acted improperly in the management of it. If it were, it might be contended that if a master directs his servant to drive slowly, and the servant disobeys his orders, and drives fast, and through his negligence occasions an injury, the master will not be liable. But that is not the law. The master in such a case will be liable, and the ground is that he has put it in the servant's power to mismanage the carriage by intrusting him with it.'

Again in *Howe v. Newmarch,* 12 Allen, 49, the Supreme Court of Massachusetts announced this rule:

And in an action of tort in the nature of an action on the case the master is not responsible if the wrong done by the servant is done without his authority, and not for the purpose of executing his orders, or doing his work. So that if the servant, wholly for a purpose of his own, disregarding the object for which he is employed, and not intending by his act to execute it, does an injury to another not within the scope of his employment, the master is not liable. But if the act be done in the execution of the authority given him by his master, and for the purpose of performing what the master has directed, the master will be responsible whether the wrong done be occasioned by negligence, or by a wanton or reckless purpose to accomplish the master's business in an unlawful manner.

A learned text-writer, after a careful review of the authorities, thus stated the rule: "It is not necessary, in order to fix the master's liability, that the servant should, at the time of the injury, have been acting under the master's orders or directions, or that the master should know that the servant was to do the particular act that produced the injury in question. It is enough if the act was within the scope of his employment, and, if so, the master is liable, even though the servant acted wilfully and in direct vio-

lation of his orders. . . . A master can not screen himself from liability for an injury committed by his servant within the line of his employment by setting up private instructions or orders given by him, and their violation by the servant. By putting the servant in his place he becomes responsible for all his acts within the line of his employment, even though they are wilful and directly antagonistical to his orders. The simple test is whether they were acts within the scope of his employment—not whether they were done while prosecuting the master's business; but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him. By authorized is not meant authority expressly conferred, but whether the act. was such as was incident to the performance of the duties intrusted to him by the master, even though in opposition to his express and positive orders." Wood on Master & Servant (1st ed.), 585. The same author said: "Without stopping to give further illustrations from the modern cases, it may be said to be well settled that the master is not only responsible for the negligence or misfeasance or malfeasance of his servant in respect of the discharge of duties expressly imposed upon him, but also in all cases where the act of the servant is within the scope of his implied authority, and in determining this the nature of the employment, and the ends and purposes sought to be attained, are material elements, and the real test of liability. *Prima facie,* when the act is one which the master himself might have done, it will be presumed that it was an act within the scope of the servant's authority, and the burden of proving want of authority rests upon the defendant." Wood on Master & Servant, 559. See, as sustaining this rule, *Jackson v. Railroad Co.,* 47 N. Y. 274 (7 Am. Rep. 448); *Higgins v. Turnpike Co.,* 46 N. Y. 23 (7 Am. Rep. 293); *Cosgrove v. Ogden,* 49 N. Y. 255 (10 Am. Rep. 361); *Schulte v. Holliday,* 54 Mich. 73 (19 N. W. 752).

Whether the servant was at the time in question acting within the scope of his employment or outside of it to effect some purpose of his own is generally a question of fact for a jury, and its verdict is conclusive, provided there be any substantial testimony to support it. *Mott v. Ice Co.*, 73 N. Y. 543; *Cohen v. Dry Dock Co.*, 69 N. Y. 170; *Schulte v. Holliday, supra*. In the light of these rules we now go to the testimony to see if there is enough to carry the case to the jury upon the only doubtful issue in the case, to wit: Was the act of the servant within the scope of his employment? In doing so we must put that interpretation upon the evidence most favorable to plaintiff, for the trial court directed a verdict for defendant, thus refusing to submit the issue to the jury.

Defendant was placed upon the stand by the plaintiff, and testified that he entered into a contract with Craven to do the plowing for so much per acre, and that he hired Butcher and Nelson to assist in the plowing, and that they were working for him at the time the fire occurred. He further testified that he gave them the following directions when they went out to plow: "I told them that they were to work out there to plow for Mr. Craven, and that I had a contract there to do plowing." He also testified as follows:

These men were to act under my orders doing the plowing, and I told them that any time they set out fire they would do it on their own responsibility. I told them beforehand, before we went out there. On this day that I was out there and started them in, Mr. Craven was there. Q. What was said by Mr. Craven that day about setting out a fire and burning off the ground? A. Well, he went with them and had them plow a fireguard. Q. He showed them where to plow? A. Yes, sir. Q. And directed them where to plow? A. Yes, sir. Q. What did he say about anyone else plowing part of the fireguard? A. He did not say anything. Q. What did he say about burning off this land after the fireguard was plowed? A. He said you can plow that, and then burn it off. Q. Who was he talking

to? A. Talking to the whole bunch there, the boys. Q. These boys that were running the plows? A. Yes, sir. Q. And then what did you say to the boys? A. I did not say anything. Q. Did you stay there? A. No, sir. Q. Well, the boys were under your control and orders as I understand. A. Well, I didn't say anything to them about that at all anyhow. Q. You didn't tell them not to, when Mr. Craven, who had nothing to do with them, told them to do this, you didn't tell them not to? A. No; I gave them my orders beforehand. Q. You gave them your orders beforehand? A. Yes, sir. Q. And they were working for you? A. Yes, sir. Q. And when Mr. Craven told them to set out fire in your hearing you didn't say anything? A. No, sir. Q. Mr. Craven had no control over them if you had control, and they were working for you? A. Well, I don't know but what he did. If they didn't do the work right, why he was there to call them down. Q. They were working for you, and you were paying them, and you hired them for that purpose, to go out there and plow the ground? A. Yes, sir. Q. Before you went out there with the boys and started them in on this job in the afternoon, had you had a talk with Mr. Craven about grass and debris? A. Well, I told them when they made the deal, I told him, that stuff had to be burned because it is pretty hard plowing. I said you can't plow it unless you do burn it. Well, he said he would see that it was burned. Q. That was at the time you made the deal with him? A. Yes, sir; the very same day. Q. And after Mr. Craven told you this, though, you entered into a contract just the same to do the plowing? A. Yes, sir; I did. Q. Whether it had to be burned off or not? A. Yes, sir. Q. After Mr. Craven had told you that, and you said it had to be burned, you were still ready to enter into a contract with Mr. Craven to do the plowing? A. Yes, sir. These men did not come in and tell me that they had set out a fire because I was not at home. I sent them back after I had found out there had been a fire two or three days afterwards. I sent them back to do the plowing. I did not discharge them because they disobeyed my orders, because I could not find men. At the time I told Mr. Craven it ought to be burned off, he told me that he would see that it was burned off, and that is the reason I entered into the contract.

Craven testified, in substance, as follows:

Mr. Eisle and myself had entered into a contract whereby he was to do some plowing on my farm at so much per acre. I know by my own personal knowledge that he went out there to do the plowing, for I went out there when he first went out, and showed him where it was to be done. I did not have anything to do with the hiring and employing of any men under him, and was not under any obligations to pay them anything. I heard this conversation in regard to the fire. There was nothing said before we entered into this contract about a fire that I remember of. He did not tell me either before or after we went out there that if a fire was set out that I would have to stand the responsibility of it. Q. Did any such conversation take place at any time? A. No. I did not at any time give orders to anybody out there to set out any fires. The day that we drove out there with Mr. Eisle, the first round in the tall grass there I told him that he could set out a fire there and burn that off if he wanted to if he put out a fireguard. If I remember, he thought he would plow it without. There was not any fireguard plowed at that time. We were just going the first round when I showed him what to plow. I don't know whether there is a fireguard plowed or not. . . . I told them they could burn it off if they would plow a fireguard. I told Mr. Eisle that. One of the men was there. There were a lot of weeds that had grown up there, and some grass to burn off. It could have been plowed without burning. It did not make any difference to me whether it was plowed with or without burning off the weeds and grass.

Another witness gave the following testimony:

This fire was set out toward the south end on the west side of the Craven land, about one-half way between north and south and on the west side. I was about five or six rods from the parties when I saw them set out the fire. I saw Claude Butcher set out this fire. He was running the engine there. Nelson was running the plow. I saw them stop the engine. After stopping the engine, Claude Butcher set out the fire. I saw him do it. He went pretty well to the center part, took a match out of his

pocket, and stooped down, and lit it, and set a fire. I saw the blaze and the fire started then. They run the engine pretty well to the north of it, and got away from the fire and then went to town. . . . This fire was set out on the line running east and west. It was set out pretty well on the west side, and the wind was blowing from the northwest. . . . It was quite a little ways from the corner of the tract of land that I was plowing. The fire was set out about halfway on the south line east and west of the land that they were plowing. They tried to plow a fireguard there, but it was so wet that the plow jumped, and they couldn't do a very good job. They had plowed just one round. I had plowed quite a strip on the east. It (the fire) did not get over on my side over through the guard. They (the men) told me they were going to set out a fire that morning when they went out. It was about half past 7 I guess when they told me they were going to set it out. They did not set it out, though, at that time, but I do not know why. When they said that they were going to set out a fire, I told them that they had better plow a bigger fireguard than they did. They said they didn't know, but they thought that would be big enough. The wind was blowing hard. South of the place where the fire was set out was a hay meadow, and the hay had not been cut on the north end. It had been too swampy. They could not cut it that fall. . . . I saw Butcher set out the fire. I didn't watch him from half past 7 that morning when he told me he was going to set it out all the time. I came to be watching him at half past 11, because I was going to dinner, and they said they were going to set it out. . . . I had known Butcher I expect about a couple of months before he came to our place. I saw him take a common match out of his pocket, and saw him strike the match, and saw a flame come up from it in front of him. . . . I saw him strike the match on his pants, and he stooped over in the grass then, and then the fire started, and it burned south right away. . . . I could see it was Mr. Butcher, and could see his actions, and was in hollering distance, and could hear what he said. I saw him get off the engine. I was watching the engine. I was about even with them. The engine had been out there before that day. I had not been near it, and never saw

it before. I saw Mr. Butcher get off the engine, and knew it was Mr. Butcher. I knew that he was going to set out the fire. He hollered at me at the time he was going to set it out. I watched, and saw what he was doing. Nelson was sitting on the plow at that time. They had made one round across the south end of Craven's field with this steam plow. They had made one round between where they had set out the fire and the land that Mr. Seybold's stacks were on. It was bull grass between where the fire was set out and Mr. Seybold's, and bull grass is high grass. The grass where the fire was set out was as high as a man's head if it had been straight, but it had been laid down. It was late, and the frost had knocked it down, I suppose. It was high grass in the locality where the fire was set out. . . . They plowed on the south end a fireguard, and they had to turn around to get their engine back. They were plowing around on the south end.

till another witness testified as follows:

The men whom I met coming to town were Mr. Butcher and the other young fellow who he was working with. The same fellows who were working this plow. They attempted to plow a fireguard on the south, but the land was in such condition that they could not plow. The plow wouldn't work, and it would slide over. The land was wet and heavy and gummy, and it would stick to the plows, and they would have to raise them out and clean them. There was nothing to hinder a fire from running through this attempted fireguard as I could see. The grass and tall weeds were sticking up through it. . . . That the fireguard consisted of an attempting to plow, and the plow would sometimes be in the ground and sometimes slide over. I wouldn't consider it a fireguard. . . . I think the engine had five plows in a gang, and in making a round on the south side in attempting to plow this fireguard they would turn over ten furrows.

Another testified: "I remember the condition of the fireguard on the south and east side. It was not very good. In plowing it was wet and the grass was heavy and high, and the plow would clog up and slide over, and then they

would have to clean out the plow and start it again, and that left places in the fireguard that wasn't plowed. I would not call it a very good fireguard."

We are constrained to hold that this testimony was sufficient to take the case to the jury upon the main proposition involved. A jury might well have found that defendant's servants in setting out the fire were acting in furtherance of their master's business, and not for any purpose of their own, and that it was set out in order to make the plowing easier. The parties had talked about setting out a fire, and furrows were plowed with defendant's knowledge for a fireguard. The owner of the land suggested that the weeds and grass be burned, and defendant not only made no objection, but expressly directed or assented to the plowing of the fireguard. There is no testimony that defendants servants set out the fire for any purpose of their own, and, while they may have been directed not to set out the fire, their act in so doing was to their minds in furtherance of their master's business. At least a jury was warranted in so finding. *Ellegard v. Ackland,* 43 Minn. 352 (45 N. W. 715).

The case was clearly for a jury, and the trial court was in error in directing a verdict. The case must be reversed and remanded for a new trial.—*Reversed and remanded.*