W. A. ORRIS, Appellant, v. TOLERTON & WARFIELD COMPANY, Appellee.

MASTER AND SERVANT: Liability to Third Persons—Departure of Servant from Zone of Service—Effect. When the range or zone of service of an employee embraced the taking of a truck to a place of storage for the night, the act of the employee in temporarily using the truck for his own personal use will not *per se* absolve the employer from liability for a negligent act by the employee occurring after the employee had resumed his duty to take the truck to its storage place, and while he was pursuing a proper route in the immediate vicinity thereof.

Headnote 1: 39 C. J. p. 1298.

*Appeal from Woodbury District Court.*—MILES W. NEWBY, Judge.

FEBRUARY 16, 1926.

REHEARING DENIED JUNE 21, 1926.

FATHER's action for damages for negligently causing the death of plaintiff's minor son. Directed verdict for defendant. Plaintiff appeals.—*Reversed.*

*Naglestad, Pizey & Johnson,* for appellant.

*Farr, Brackney & Farr,* for appellee.

MORLING, J.—The plaintiff's four-year-old boy was run over by defendant's truck, then being operated by Elmer A. Taylor, an employee. Defendant seeks to sustain the ruling of the court below directing a verdict in its favor upon the grounds: 1. The driver of the truck was not negligent. 2. The plaintiff (not the child) was negligent. 3. On the occasion of the accident, Taylor was outside the scope of his employment. The first two grounds need but little attention.

I. Plaintiff introduced a number of witnesses from whose testimony it might be found that the little boy, when struck, was, and for five minutes had been, standing on the parking on the west side of the street, three or four feet east of the sidewalk. The width of the street is not shown. In the center was a pavement 16 feet in width. The west edge of the pavement was 14 feet from the sidewalk. There was no curbing. The vehicle traffic extended over upon the dirt road on either side of the paving. About 7 feet east of the sidewalk was a ridge or bank (referred to as a curb) paralleling the paving, and about 18 inches high. Taylor was driving south, and, just before the accident, at the speed of about 20 miles an hour. Shortly before the accident, he had driven off the pavement, and had nearly bumped into a car which was trying to pass him, the driver of which felt impelled to turn into another street. Defendant's truck approached the point of the accident without warning signal, and, without any apparent cause, unless carelessness or incompetency of driver, ran over the ridge toward and within 2 feet of the sidewalk, and, turning again to the roadway, stopped at or near the catch basin. The right front wheel passed over the body of the little boy, inflicting

injuries from which he soon died. The boy had previously gone across the street with his father, but had returned alone to the parking. Plaintiff, in returning across the street, saw the boy on the parking (in a place of safety), and also saw the truck approaching, and watched for it to pass. The accident occurred in front of his residence, which was on the west side of the street.

The testimony of these witnesses was flatly contradicted by the testimony of those of the defendant, which would show that the defendant's truck was being driven entirely on the pavement, and that the little boy suddenly ran out from behind a store truck on the east side of the paving, and was not seen by Taylor until he unexpectedly appeared in front of defendant's truck, which was swerved to the west in the effort to avoid a collision.

The questions of negligence and of plaintiff's contributory negligence were for the jury.

II. We do not discuss the point made in the motion that there was no competent evidence of damage. It is not argued, and, on the record, could not well be.

III. The accident occurred in Sioux City. We gather from the abstract that the numbered streets run east and west, the numbering being from the south to the north. Nebraska, Pierce, Myrtle, and Ross Streets run north and south, in the order named, from east to west. Myrtle Street was one of the main thoroughfares of the city. The accident occurred on the west side of Myrtle, in the block immediately north of Twentieth Street, at about 6 o'clock in the evening. The defendant's warehouse and place of business is at Third and Nebraska. The truck belonged to the defendant, and had been driven by Taylor for several months. Defendant operated a wholesale grocery house, and Taylor was engaged in making truck deliveries of merchandise to the retailers in the city. Ordinarily, his day's work ended at about 6 o'clock, but sometimes as late as 7:30 P. M. At the time of the accident, the truck was being kept at Taylor's residence, on Ross Street, in the block just north of Twentieth, and four blocks west of plaintiff's premises, where the accident happened. In taking the truck directly from defendant's place of business to Taylor's residence, Taylor might

go westward on Twentieth, crossing Myrtle Street, but he would not go north of that intersection.   Taylor's mother lived at Myrtle and Thirty-second Street, some 12 blocks north of the place of the accident.   When Taylor left the warehouse on the evening of the accident, he went north on Pierce Street to his mother's place.   He there got a bed spring, to take to his own home.   From his mother's home he drove south on Myrtle Street, and on the way met with the accident, as has been related, just north of Twentieth.   It is the claim of the defendant that, in his journeying north of Twentieth, Taylor was exclusively in the prosecution of his own private affairs, and was not in the line of his employment, and that his negligence is, therefore, not chargeable to defendant.   Taylor testified:

"I think the shipping clerk would remember that I left the wholesale house at approximately 5 o'clock that day of the accident; but there is no record kept of it, and I am only giving my best recollection as to the hour.   I cannot say whether I had any goods in the truck to deliver or not, when I left the wholesale house.   I might have had one delivery to make.   I think probably I did have one.   At the time of the accident, I had no more goods for delivery, because the car was empty.   There were a lot of grocery stores out west of my home where I have delivered goods, and then come back and put up the truck.   I have come down by the scene of the accident many times at night, returning in the evening from delivering goods.   I have delivered in the extreme west part of the city out at Riverside, and have come in at night.   It is true that, in driving home from delivering goods, I might have to drive in any direction to reach my home.   I had no deliveries to make at any place near Twenty-second and Myrtle Street, the night of the accident. There are four stores north of the place of the accident, and right in that neighborhood.   I am prepared to swear that I didn't deliver goods out in that neighborhood just before getting the bed spring. * * * Q. Don't you believe, then, you wouldn't have done that unless you had goods out there in that neighborhood to deliver? Would you have gone after express, or whatever it was, unless you had goods to deliver for the company in that very neighborhood? A. I did. Q. Or unless you had permission? A. I did. I have done such things since

I have been keeping the Tolerton & Warfield truck at my home, without securing the permission of the company. I couldn't say how many times, but not very frequently. It was a special urgency, my getting this bed spring on this night. The dealers in that neighborhood are [four named]. Three of them are engaged in the grocery business, and are customers of the company. I have delivered goods to them times without number, but I am prepared to swear that I did not deliver goods to them on this night of the accident. I remember that distinctly, because I came directly south from my mother's place, and did not stop; and I remember that I didn't stop because I didn't go out that way. I don't think I can state any particular place where I delivered on that day. * * * One of these stores is four blocks from my mother's house, another is five, and two of them are approximately six blocks. * * *

"The Court: Do I understand now, Mr. Taylor, that you went from the warehouse direct to your mother's for this bed spring? A. I went from the warehouse directly out to my mother's. I can't say. I wouldn't swear to the fact that I didn't have one order on my wagon, going out. Now, I can't swear to that.

"The Court: I am not asking you anything about orders. I am asking you where you went after you left the warehouse. A. I went up Pierce Street and down Pierce Street Extension and to my mother's place.

"The Court: And got the spring? A. Yes. * * * You did not misunderstand me when I said I had or might have had some goods to deliver on that night before I reached my mother's place to get the bed spring. I might have,—I couldn't swear that I did not."

Defendant's treasurer testified:

"Our investigation after the time of the accident in controversy showed that Mr. Taylor was not working in the line of his employment at the time of the accident. Q. That is all hearsay with you, and you don't know that of your own knowledge? A. We, of course, investigated the accident afterwards. Q. But you don't know that of your own personal knowledge,—that is what someone may have told you? A. Well, I didn't see it,—I wasn't there. * * * The investigation we made showed

Mr. Taylor had gone out of his route, stopped at his mother's house, and was taking a bed, I think, to his own house,—all of which we knew nothing about until afterwards. * * * Q. It was his duty to drive it up and leave it at the garage? A. At that time, he was keeping it at home, I think, in his garage. * * * It was his duty, as our servant, to drive the truck to the garage and keep it there. Our investigation developed that he had not put the truck away for the day, at the time the accident occurred; and I now so understand it. Mr. Taylor was authorized to and did keep this delivery truck of the company in his own garage at his own home. * * Q. Now, there are a good many times when Mr. Taylor would be delivering goods for your company as late as 6 and 7 or 7:30? A. That would depend a little on whether they had loaded the goods late, and how many stops he had. 7:30 would be pretty late. Q. But he did work as late as 7:30, delivering goods? A. I wouldn't be sure. * * * I don't know when Taylor left the wholesale house on that day, nor where he delivered the last item of the merchandise. Q. You don't say that Taylor wasn't on a run for your company at the time he ran over this child, do you, Mr. Packer? A. No driver of any of our trucks has any right to use our car in his own private business. I know enough about the state laws to know we can't afford to give that permission, and we haven't given it [in?] special cases, and this wasn't one of them. I don't know, as a matter of fact, whether Taylor was through delivering groceries or not, at the time of the accident. * * * I was satisfied with the result of the investigation,—yes. Q. That he was not working in your employ at that time? A. That he was not, at that time.''

The undisputed facts that the truck belonged to defendant, that Taylor was employed by defendant to operate it, and with it to deliver merchandise over the city, together with the fact that the accident occurred within the territory in which he was employed, and during hours within which deliveries were or might be made, would justify the jury in inferring that Taylor, at the time of the accident, was in the line of his employment. *Landry v. Oversen,* 187 Iowa 284; *Baldwin v. Parsons,* 193 Iowa 75; *Curry v. Bickley,* 196 Iowa 827; *Mooney v. Canier,* 198 Iowa 251; *Napier v. Patterson,* 198 Iowa 257. See, further, *Stumpf v.*

*Montgomery,* 101 Okla. 257 (226 Pac. 65).; *Lee v. Pierce,* 112 Okla. 212 (239 Pac. 989).

Disregard of instructions, or mere deviation by Taylor from his strict line of duty, though for purposes of his own, would not, of itself, relieve defendant from responsibility. The departure must have been so substantial as to amount, for the time being, to an abandonment of the business of the defendant, and to the serving of some purpose wholly independent of it. *Jones v. Lozier,* 195 Iowa 365; *Curry v. Bickley,* 196 Iowa 827; *Rowland v. Spalti,* 196 Iowa 208; *Traynor v. Keefe Const. Co.,* 199 Iowa 575; *Baker v. Allen & Arnink Auto Rent. Co.,* 231 N. Y. 8 (131 N. E. 551); *Ritchie v. Waller,* 63 Conn. 155 (28 Atl. 29, 38 Am. St. 361, 27 L. R. A. 161); *Loomis v. Hollister,* 75 Conn. 718 (55 Atl. 561).; *Thomas v. Lockwood Oil Co.,* 174 Wis. 486 (182 N. W. 841); *McKeage v. Morris & Co.* (Tex. Civ. App.), 265 S. W. 1059; *Gulf Ref. Co. v. Texarkana & Ft. S. R. Co.* (Tex. Civ. App.), 261 S. W. 169.

Whether the servant at a given time is acting within the scope of his employment must usually be decided not only from the established facts, but from presumptions and inferences raised by them. The question is usually one of fact for the jury, and rarely one which may be disposed of by the court, as a matter of law. *Seybold v. Eisle,* 154 Iowa 128, 135; *Gulf Ref. Co. v. Texarkana & Ft. S. R. Co.* (Tex. Civ. App.), 261 S. W. 169; *Michael v. Southern Lumber Co.* (N. J.); 127 Atl. 580; *Venghis v. Nathanson* (N. J.), 127 Atl. 175; *Ritchie v. Waller,* 63 Conn. 155 (28 Atl. 29, 38 Am. St. 361); *Loomis v. Hollister,* 75 Conn. 718 (55 Atl. 561); *McKeage v. Morris & Co.* (Tex. Civ. App.), 265 S. W. 1059; 39 Corpus Juris 1361, 1362. If Taylor, at the time of the accident, was acting in the course of and within the scope of his employment, defendant would be liable for his negligence, notwithstanding the fact that he might at the same time have been serving some purpose of his own. *Jones v. Lozier,* 195 Iowa 365; *McKeage v. Morris & Co.* (Tex. Civ. App.), 265 S. W. 1059; *Thomas v. Lockwood Oil Co.,* 174 Wis. 486 (182 N. W. 841); *Gulf Ref. Co. v. Texarkana & Ft. S. R. Co.* (Tex. Civ. App.), 261 S. W. 169.

The deviation claimed was, at most, a suspension or temporary abandonment by Taylor of the defendant's service. If

Taylor, in going to his mother's house for the bed spring, did totally depart from defendant's business for his own exclusive purpose, the relationship of master and servant was restored when he returned to the point of departure or the zone of service as it was when he left it; for it remained his duty to take the truck thence to his home. When he returned to that point, or to a point that might be said to be within the zone of his employment on that occasion, and was engaged in taking the truck to his home, the defendant's liability for his acts afterward occurring in the conduct of the business was re-established. *Curry v. Bickley*, 196 Iowa 827; *Riley v. Standard Oil Co.*, 231 N. Y. 301 (132 N. E. 97); *Barmore v. Vicksburg, S. & P. R. Co.*, 85 Miss. 426 (38 So. 210); *Thomas v. Lockwood Oil Co.*, 174 Wis. 486 (182 N. W. 841); *Cummings v. Republic Truck Co.*, 241 Mass. 292 (135 N. E. 134). It cannot be said, as matter of law, on this record, that the accident would not have happened if Taylor had not gone to his mother's house. *Cummings v. Republic Truck Co.*, 241 Mass. 292 (135 N. E. 134).

We think that the jury might find, on the evidence, that Taylor, on leaving the warehouse, did have a delivery to make. The evidence does not show that the delivery (if there was one) was not to be made north of Twentieth Street. There was no departure from the line of employment in going by a proper or customary route to the place of such delivery. If the place of delivery were north of the place of the accident, the point of departure, if there was one, was not south of that place. It was Taylor's duty to make the delivery and then proceed with the truck to his own home. There is no evidence that the delivery, if there was one, was made west of Myrtle Street, or so far west of it that his return to Myrtle Street would be an entire departure from the scope of his employment. We do not think the court was warranted, on this record, in ruling, as matter of law, either that Taylor, in going to his mother's house, did depart from the line of his employment to such an extent as to relieve the defendant from responsibility for his conduct on his way back to his own home with the truck, or that he had not, at the time of the accident, resumed performance of the duties of his employment.

In brief, we think that the defendant, in going forward

with its evidence, did not so conclusively establish that Taylor, at the time of the accident, was engaged outside of the scope of his employment, as to justify the court in taking the case from the jury.

The judgment is—*Reversed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.