447 F.2d 234
 MERCHANTS NATIONAL BANK OF CEDAR RAPIDS, Administrator of
the Estate of Elizabeth W. Smith, Deceased, Appellee,
v.
Larry WATERS, Administrator of the Estate of Delmar Messer,
Deceased, and The Boeing Company, Appellants.
MERCHANTS NATIONAL BANK OF CEDAR RAPIDS, Administrator of
the Estate of Mignon Pease, Deceased, Appellee,
v.
Larry WATERS, Administrator of the Estate of Delmar Messer,
Deceased, and The Boeing Company, Appellants.
 Nos. 20727, 20728.
 United States Court of Appeals, Eighth Circuit.
 Aug. 30, 1971, Rehearing and Rehearing En Banc Denied Sept. 22, 1971.
 
 Keith E. Stapleton, Raymond R. Stefani and Silliman, Gray & Stapleton, Cedar Rapids, Iowa, for the Boeing Co.
 John T. Nolan, Nolan, Lucas & Nolan, D. C. Nolan, Edward W. Lucas, Iowa City, Iowa, for appellees.
 Before LAY, HEANEY and BRIGHT, Circuit Judges.
 LAY, Circuit Judge.
 
 
 1
 Merchants National Bank, the administrator of the Estate of Elizabeth W. Smith, deceased, and of the Estate of Mignon Pease, deceased, recovered verdicts of $125,000 and $65,000, respectively, from The Boeing Company, by reason of the negligence of its employee, Delmar Messer, now deceased.[1] Reversal of the judgment is sought on two basic grounds: (1) there was insufficient evidence to sustain plaintiff's claim that Delmar Messer was acting within the scope of his employment with Boeing at the time of the accident in question and (2) that the verdicts were excessive.[2] We affirm the judgments rendered.
 
 
 2
 The sole issue relating to the liability of The Boeing Company is whether Delmar Messer was acting within the scope of his employment with The Boeing Company at the time of the accident. The trial court considered the issue as one of fact under Iowa law and submitted the question to the jury who determined it adversely to Boeing.
 
 
 3
 On July 26, 1966, an automobile accident occurred when Messer was driving his personal automobile westbound on I-80 near Oxford, Iowa. His vehicle suddenly crossed the grass median of the interstate highway and veered into the oncoming lane of traffic, colliding with the eastbound vehicle occupied by the decedents. Elizabeth Smith, 23 years old, was severely injured and died ten days later. Mignon Pease, age 22, died instantaneously. Delmar Messer had worked as a tool designer for Boeing since 1953. In March, 1963, he was transferred from Seattle, Washington to Boeing's Michoud plant near New Orleans. He had been assured at the time of this transfer that upon conclusion of this work at Michoud (estimated to be three to five years) he would be moved back to Seattle by Boeing at company expense. At the time of the transfer he was reimbursed fully for his expenses and given thirty days per diem as well as one month's salary for relocation pay. In March, 1965, having become dissatisfied with living and working conditions in Louisiana, Messer asked for a transfer either to Seattle or Huntsville, Alabama. He was at that time placed on a 'surplus list.'[3] Ultimately, in June or July of 1966, he and many other Michoud employees were interviewed by the project chief of tool design on the SST program. At this time there was a growing need in Seattle for workers with tool design skills. Messer was selected and authorized to transfer to Seattle. On his transfer, the company placed Messer under a partial rather than a full reimbursement plan. It authorized this reimbursement as thereby fulfilling its prior obligation to return Messer back to Seattle.[4] His travel authorization included a travel advance of $300, reimbursement per diem for nine and one-half days travel time, mileage expenses and household moving and warehousing expenses. Messer's travel orders required him to report to a Mr. Shawlee at a particular building in Seattle on August 8, 1966. Although the company did not specify any particular route mileage was allowed for 2,610 miles, the most direct routing. The reporting date specified Messer to have six days travel time and three and one-half days to relocate in Seattle.
 
 
 4
 On this transfer Boeing did not allow (as it had on his earlier transfer to New Orleans) a relocation allowance (thirty days per diem) nor did it pay Messer's salary. There was evidence introduced that Boeing would have been obligated to pay Messer's salary if he had been traveling on company business. However, Messer arranged with Boeing to have his vacation time coincide with his travel time so that he would continue to be on full salary. In his deposition Messer testified that the trip route he was on the day of the accident was the result of a dual purpose. First, he had visited relatives in Peoria, Illinois, and at the time of the accident was with his family enroute to visit the Black Hills; second, he was traveling westward to Seattle so as to arrive in time to report to his new company assignment.
 
 
 5
 We now turn to the governing law. Boeing emphasizes that its absence of control over Messer at the time of the accident is indicative of his being outside the company's scope of employment. We deem this argument and authority cited as not germane to the primary issue here. The right of an employer to control the details of an employee's work accurately tests the existence of a master-servant relationship. Restatement (Second) on Agency 2 (1958). Here, however, there is no dispute that Messer was the employee of Boeing. The sole and critical issue is whether he was operating within the scope of his employment at the time in question. As stated by the Ninth Circuit in United States v. Romitti, 363 F.2d 662 (9 Cir. 1966):
 
 
 6
 'The government (argues) * * * the employer exercises no control over the details of the driving, and driving is not a part of the employee's normal duties.
 
 
 7
 'In the present case the flat rule which the government suggests would preclude employer liability in circumstances in which the purpose of the rule requires its imposition. Id. at 665. 'The failure of the employer to exercise control over the employee's driving is a factor of varying importance. Existence of the power to control the physical details of the service may be crucial when the question is whether the actor is an agent or an independent contractor, but may be relatively insignificant in determining whether an admitted agent is acting within the scope of his employment.' Id. at 666. Our analysis of Iowa law is that an employer's control or right to control is inapposite as a basic test of scope of employment. Sandman v. Hagan, 261 Iowa 560, 154 N.W.2d 113 (1967). In Sandman the court observed: 'It has been said an act is 'within the scope of the servant's employment' where such act is necessary to accomplish the purpose of the employment and is intended for such purpose, although in excess of the powers actually conferred on the servant by the master.' Sandman v. Hagan, supra at 117. See also, Seybold v. Eisle, 154 Iowa 128, 134 N.W. 578, 580-581 (1912); United States v. Farmer, 400 F.2d 107, 110-111 (8 Cir. 1968).
 
 
 8
 The traditional test in determining scope of employment where personal and business interests jointly motivate the employee is that crafted in Marks' Dependents v. Gray, 251 N.Y. 90, 167 N.E. 181 (1929), by Judge Cardozo while on the New York Court of Appeals where he stated: 'The test in brief is this: If the work of the employee creates the necessity for travel, he is in the course of his employment, though he is serving at the same time some purpose of his own.' This is commonly known as the dual purpose test and has been approved by the Iowa Supreme Court. Golay v. Keister Lumber Co., 175 N.W.2d 385, 388 (Iowa 1970);[5] Pribyl v. Standard Electric Co., 246 Iowa 333, 67 N.W.2d 438, 442 (1954); Orris v. Tolerton and Warfield Co., 201 Iowa 1344, 207 N.W. 365, 368 (1926).
 
 
 9
 Judge Matthes summarized in United States v. Farmer, supra, the Iowa law governing applicable principles as to scope of employment. He authoritatively writes that Iowa follows a more 'liberal' rule, quoting from Seybold v. Eisle, supra, where the court stated:
 
 
 10
 'The simple test is whether they were acts within the scope of his employment-- not whether they were done while prosecuting the master's business; but whether they were done by the servant in furtherance thereof, and were such as may fairly be said to have been authorized by him.'[6] 134 N.W. at 581.
 
 
 11
 We find sufficient evidence on the present record to hold that it was a jury question as to whether the employer's business was being furthered by Messer's trip. There was evidence by company officials that the journey was fulfilling Boeing's need; that, in fact, the company's need was a substantial factor in Messer's transfer.
 
 
 12
 Cf. Seavey, Law of Agency, 87 at 151 (1964). The jury could likewise consider that although Messer initiated the transfer, it was not until a year later that the company authorized his actual transfer. The fact that Messer still had an option to remain in Louisiana is immaterial; once he exercised the option to transfer he was furthering the company's request. See, Welch v. Thompson, 145 Mont. 69, 399 P.2d 748, 754 (1964).[7] It is also undisputed that the order for Messer to go to New Orleans in 1963 was viewed as company business by Boeing. Even though it was Messer who initiated his return and retransfer to Seattle, the evidence discloses that the company nevertheless recognized it as part of its original obligation to return the employee to Seattle. Thus, the jury could have also viewed the transfer from Seattle to New Orleans in 1963 and from New Orleans to Seattle in 1966 as a continuing transaction all necessitated by company business.
 
 The Iowa Supreme Court has said:
 
 13
 'Whether the servant at a given time is acting within the scope of his employment must usually be decided, not only from the established facts, but from presumptions and inferences raised by them. The question is usually one of fact for the jury, and rarely one which may be disposed of by the court as a matter of law.' Orris v. Tolerton and Warfield Co., 201 Iowa 1344, 207 N.W. at 368; Napier v. Aatterson, 198 Iowa 257, 196 N.W. 73, 75 (1923).
 
 
 14
 Under the facts and applicable Iowa law we find the issue of respondeat superior properly submitted to the jury.
 
 Damages
 
 15
 We turn now to the complaint that the damages were excessive. The one verdict of $125,000 was attributable to the pain and suffering from injuries received by Elizabeth Smith as well as for her wrongful death. Mignon Pease was killed instantly and the verdict of $65,000 relates solely to damages for her death. We need not detail the evidentiary background as to the girls' overall traits. The evidence sufficiently demonstrated that both had been exceptionally bright students in college, with emerging careers in the field of foreign service. Under Iowa law wrongful death damages for a girl, not a spouse or parent,[8] are measured by the reasonable accumulation of monies to the estate of the decedent had she lived out her life expectancy.
 
 
 16
 Under this rule the Iowa Supreme Court has aptly observed in Brophy v. Iowa-Illinois Gas & Electric Co., 254 Iowa 895, 119 N.W.2d 865 (1963):
 
 
 17
 'This rule is vague, uncertain, and speculative, if not conjectural, but it is the best which judicial wisdom and experience have been able to formulate. No evidence is possible of the time which deceased would have lived but for the injury complained of. Had he avoided this injury, death may have met him the next day, week, or year in some other form. In business he might have become a phenomenal success and accumulated millions, or he might have lived to old age and died a pauper. From a man of good habits, prudence and industry, he might have become a spendthrift or a tramp, or if a man of dissolute habits he might have reformed into an efficient and prosperous citizen. But the demands of justice will not tolerate the taking of human life by the tort of another without the wrongdoer answering therefor in damages, and the rule we have stated is the one which has been devised for this purpose. The difficulty in its practical application lies in the fact it calls for an estimate which must be arrived at by a balancing of mere probabilities which the jury must infer from the age, character, habits, condition, education, employment, surroundings, and apparent capacity of the deceased.' Id. at 866.
 
 
 18
 In DeToskey v. Ruan Transportation Co., 241 Iowa 45, 40 N.W.2d 4 (1949), the Iowa court added:
 
 
 19
 'In considering the question of the claimed excessiveness of a verdict, we must keep in mind that it is within the province of the jury to determine the amount to be allowed in any particular case. Until our system of jurisprudence determines that some other system is more satisfactory and more accurate in arriving at the real damage, we must leave it to our juries to set the amount of recovery. We have endeavored without success to reconcile the various theories of computing the possible verdicts respectively made by counsel for the appellant and appellee. We cannot as yet say that this court is in a position to determine the exact value of an individual's life. There are too many factors to be taken into consideration. Besides, that is the province of the jury.' Id. at 6.
 
 
 20
 The court then quoted from Collins v. City of Council Bluffs, 32 Iowa 324, 331-332, 7 Am.Rep. 200:
 
 
 21
 'It is the duty of the jury to assess the damages in cases of this character; the law imposes that duty upon them in consideration of their fitness to discharge it. Neither in fact nor in law are courts better prepared to discharge it; they are not under the law charged with that delicate duty, and should not indirectly assume its exercise when, according to their judgments, verdicts do not accord with their views in the exact amount of damages allowed. If we may remit a part of a judgment, or direct a new trial simply because we think a verdict is far too great a sum, why may we not add to a judgment or order a verdict when, in our opinion, the verdict is not sufficient in amount? In no case ought a verdict be disturbed unless it is so flagrantly excessive as to raise a presumption that it was the result of passion, prejudice, or undue influence, and not the result of an honest exercise of the judgment and the lawful discretion of the jury.' Id.
 
 
 22
 The Iowa Supreme Court has pointed out on more than one occasion that the court has a right to take into consideration the greatly reduced purchasing and earning power of the dollar. See, Thornbury v. Maley, 242 Iowa 70, 45 N.W.2d 576 (1951). In Waterloo Savings Bank v. Waterloo Cedar Falls & Northern Ry., 244 Iowa 1364, 60 N.W.2d 572 (1953), the Iowa court said: 'We take judicial notice of this cheapening of the currency and we consider the amount allowed by the jury in light of the lessening buying power of the dollar.' Id. at 579. See also, DeToskey v. Ruan Transportation Co., supra, 40 N.W.2d at 7.[9]
 
 
 23
 The Iowa court has additionally observed that comparison of verdicts and use of mathematical computation is an improper guideline to test excessiveness of a verdict. Ferris v. Riley, 251 Iowa 400, 101 N.W.2d 176 (1960); Newman v. Blom, 249 Iowa 836, 89 N.W.2d 349 (1958); Mallinger v. Brussow, 252 lowa 54, 105 N.W.2d 626 (Iowa 1960). The Iowa court commented in DeToskey v. Ruan:
 
 
 24
 'All we can do and should do is to leave the matter of the verdict to the jury in any particular case. Only when it can be affirmatively shown that prejudice and passion existed should this court interfere, or when there has been an apparent disregard of the evidence or of the law as given in the instructions. Grafton v. Delano, 175 Iowa 483, 492, 154 N.W. 1009; Engle v. Nelson, 220 Iowa 771, 784, 785, 263 N.W. 505. It has also been stated by this court that a further test for determining whether a verdict should be set aside because of its excessiveness or inadequacy is that it shocks the conscience. In re Estate of Hollis, 235 Iowa 753, 760, 16 N.W.2d 599, and cases cited.' 40 N.W.2d at 7.
 
 
 25
 The Iowa Supreme Court in Brophy has observed that the measure of death damages in Iowa is 'vague, uncertain and speculative, if not conjectural.' 119 N.W.2d at 866. In view of this candid appraisal, for an appellate court to hold a verdict excessive under such standards would be to impermissibly replace the jury's judgment with that of the court's. This reluctance to interfere should be altered only when a verdict is obviously shocking and unconscionable or can be traced to some prejudicial error at trial. A jury is a far safer fact finder than one or more judges. Not only do they hear and observe the witnesses' testimony from many vantage points, but the jury as an aggregate tends to better resolve contested facts by a composite understanding of common affairs and community values. Under the principles enunciated by the Iowa Supreme Court, we must conclude that to set aside the verdicts as excessive in this case would be contrary to the Iowa law to which we must adhere.
 
 
 26
 Judgments affirmed.
 
 
 27
 BRIGHT, Circuit Judge (dissenting).
 
 
 28
 I respectfully dissent.
 
 
 29
 I cannot agree that Delmar Messer was acting within the scope of his employment at the time of the accident, thereby subjecting Boeing to vicarious liability for his negligent acts. The majority's conclusion is premised upon the theory that the right of an employer to control the acts of his employee is immaterial in determining whether the employee is acting within the scope of his employment. This position is not without some support. Several cases involving military personnel contain statements indicating that once a masterservant relationship has been established control need not be shown. E.g., Hinson v. United States, 257 F.2d 178 (5th Cir. 1958); see United States v. Farmer, 400 F.2d 107 (8th Cir. 1968); Cooner v. United States, 276 F.2d 220 (4th Cir. 1960). In my view, these cases rest on the power of control which is characteristic of military service. In each case, the court has assumed that the serviceman was subject to the control of the government. See Farmer, supra; Hinson, supra.
 
 
 30
 My examination of the Iowa decisions which treat the question presented here convinces me that we cannot discount the element of control as the touchstone of vicarious liability under Iowa law.
 
 
 31
 In Heintz v. Iowa Packing Co., 222 Iowa 517, 268 N.W. 607 (1936), the question presented was whether the defendant company was liable for the negligent driving of one of its traveling salesmen who had deviated from his assigned route. The company contended that it could not be held accountable for the acts of the salesman because it neither maintained nor exercised control over him. The Iowa Supreme Court rejected this contention, finding that:
 
 
 32
 Randolph (the salesman) was under the control of the appellant company. On the very night before this accident happened, at about 7:30, the assistant sales manager telephoned him at Fort Dodge. Had the sales manager at that time directed Randolph to go to some certain place it would have been his duty to follow that instruction. His entire time was occupied by his work. * * *
 
 
 33
 We believe the better rule is that where the employer has control over the employee, the fact that the employee uses his own automobile is wholly immaterial if that automobile is being used when the employee is in the course of his employment. In other words, the control of the man behind the wheel is the same as the control of the wheel, for that car will go wherever the man directs it, and the man will direct it wherever the appellant company that has control over him orders him to go. Randolph was a servant of the appellant company, doing its bidding, acting under its instructions at all times. (268 N.W. at 615-616)
 
 
 34
 I consider Ehmke v. Sioux City, 257 Iowa 115, 131 N.W.2d 821 (1964), which discusses the scope of employment issue in a non-vicarious liability context, to have bearing on the problem presented here. There, the plaintiff sustained injuries when struck by an automobile which was being operated in a negligent manner by a person employed as an inspector by the defendant city. The plaintiff sought to hold the city liable for permitting an incompetent driver to operate a motor vehicle in connection with his employment. In denying recovery, the court said:
 
 
 35
 There was no evidence whatsoever to connect the city with the accident except the naked fact that Sterling was a city employee. Sterling was not driving a city-owned vehicle. There was nothing to show that he was on city business. Sterling was not on the job at the time. * * *
 
 
 36
 Except that every employed person has to get to his place of employment in some way the use by Sterling of his car was in no way connected with his duties. He was not required to travel. He had no duties requiring the use of a car. He had no assigned duties requiring the use of his car. * * * We find no * * * evidence whatsoever to show that Sterling was acting within the * * * control of the city. * * * (131 N.W.2d at 822)
 
 
 37
 From these cases, I conclude that the element of control is a crucial factor in determining whether an employee is acting within the scope of his employment under Iowa law.
 
 
 38
 The record here is devoid of any evidence indicating that Boeing retained the right to exercise control over Delmar Messer at the time of the accident. It is clear that Messer: (1) had no required duties to perform for Boeing during the trip from New Orleans to Seattle; (2) was free to choose any travel route for the trip; (3) scheduled his vacation time to coincide with the trip; and (4) was being carried on the company records as a vacationing employee at the time of the accident. Under these circumstances, I have grave doubts that the Iowa courts would impose liability on Boeing under the doctrine of respondeat superior. I would reverse.
 
 
 
 [1]
 The administrator of the estate of Messer was also a party defendant and did not appeal
 
 
 [2]
 Other grounds of error are raised in appellant's brief on appeal. We find no substance to the many claims of error which relate to the trial court's rulings on evidence and the propriety of some of the court's instructions. Analysis of these issues demonstrate to this court no prejudicial error resulted and we direct our discussion to the more basic issues before us
 
 
 [3]
 The surplus list consisted of people that Boeing was willing to release from the Michoud plant
 
 
 [4]
 The company regulations provided, in part:
 'The Company will normally not pay the costs of relocating an employee who requests a transfer for personal reasons. This policy should not work to the disadvantage of employees who volunteer their availability for relocation or who respond to a company announcement of requirements for their skills at other locations.' The project chief who interviewed Messer in New Orleans for the Seattle job said, 'We were obligated to the people we brought down to the New Orleans area from Seattle to return them to Seattle even though it might be to lay them off. We had to pay their way back here. This pay was similar to regular pay for transfer of assignment.'
 
 
 [5]
 Some effort has been made to limit this doctrine to only workmen's compensation cases (Marks was such a case) on the ground that such cases are not appropriate sources of reference in determining respondeat superior liability. Conversions and Surveys, Inc. v. Roach, 204 F.2d 499 (1 Cir. 1953). Cf. Cooner v. United States, 276 F.2d 220, 230 n. 10 (4 Cir. 1960). Though Golay, cited as approving Marks, is a workmen's compensation case, we note nothing in the Restatement of Agency (Second) 236 which limits the dual purpose test to such cases. This circuit has applied the dual purpose test in at least one other respondeat superior case. Burger Chef Systems, Inc. v. Govro, 407 F.2d 921, 927 (8 Cir. 1969) (applying Missouri law)
 
 
 [6]
 The defendant relies on Frazier v. United States, 412 F.2d 22 (6 Cir. 1969). Frazier is factually distinguished. There the employee was authorized to go to another city to look for housing prior to his actual transfer. Here Messer was involved in the act of being transferred. We note further Judge Phillips' strong and appealing dissent
 
 
 [7]
 Recovery has been allowed in other jurisdictions under similar facts: See Bready v. Tipton, 407 P.2d 194 (Okl.1965) (Employee, assigned to job in distant city where employer had advanced expenses of trip before departure, was traveling in his own car with his wife when accident occurred. He had planned the trip wholly on his own and performed no duties for the employer during it. Court found no error in submitting issue of employer's liability to jury which held employer liable.); Johnson v. Franklin, 312 F.Supp. 310 (S.D.Ga.1970) (Two cases involving members of armed forces driving their own cars enroute to new assigned duty posts traveling on leave time during which they had journeyed a considerable distance off the direct route to the assigned posts prior to the occurrence of the accidents. Court found problem to be generally a factual issue and concluded government, as employer, was liable.); O'Brien v. United States, 236 F.Supp. 792 (N.D.Me.1964) (Serviceman traveling in his own car to another assigned duty station where government was indifferent to route and method of travel and exercised no control over details of driving. Individual was traveling on direct route at time of mishap but had intended later to deviate to take wife to parents in Wisconsin. Court concluded element of control not decisive and held government liable since service was performed for master's benefit.)
 
 
 [8]
 See, discussion of Iowa law and recent statutory amendments relative to measure of damages in Schmitt v. Jenkins Truck Lines, Inc., 260 Iowa 556, 149 N.W.2d 789, 790-791 (Iowa 1967)
 
 
 [9]
 Inflationary depreciation of the dollar has not slackened over the years. It has been recently reported that a salary of fifty thousand dollars earned in 1966 has only a current (1971) purchasing power of $42,905. TIME, July 26, 1971 at 57