SHELDON O. MILLER et al., Appellees, v. IOWA ELECTRIC LIGHT & POWER COMPANY et al., Appellants.

No. 47329.

(Reported in 34 N. W. 2d 627)

1258

NOVEMBER 16, 1948.

Boardman, Cartwright & Druker, of Marshalltown, for appellants.

Roy L. Pell and Joe B. Tye, both of Marshalltown, for appellees.

WENNERSTRUM, J.—The Iowa Electric Light & Power Company, the principal defendant herein, sought through condemnation proceedings to acquire a right-of-way through a portion of the farm property purchased on contract by Sheldon O. Miller and Lanor T. Miller, his wife, from the Union Central Life Insurance Company. Harry W. Jennings, sheriff, is also named as one of the defendants by reason of his official connection with the proceedings but no claim for damages is made against him. A sheriff's condemnation jury awarded damages to the plaintiffs, Miller, his wife and the Insurance Company. The plaintiffs appealed by reason of the condemnation award. Upon trial to a jury damages were allowed the plaintiffs in the sum of $1500. After submission of a motion for new trial, which was overruled, a judgment for the amount of the verdict was entered in favor of the plaintiffs. The defendant company has appealed.

The farm purchased by the appellees, Sheldon O. Miller and his wife, consists of 220 acres. This farm is adjacent to the city limits of Marshalltown and is located on paved Highway No. 14. Eighty acres of the land lies west of the paved highway and the remaining 140 acres lies east of it and south of a rock

and graveled road. The transmission line, the erection of which necessitated the condemnation proceedings, cuts diagonally through the 140-acre tract. The land condemned is 100 feet wide and is approximately 2200 feet in length. The poles or stations, which the light company has erected on this property, are four in number. Part of the poles erected are dual in nature with a 28-foot crossarm connecting them. The first two poles from the north are located just south of the rock and graveled road with one on each side of a fence running north and south. This set of poles is located approximately 50 feet south of the north fence. The next two poles are located approximately 100 feet out in a cultivated field and are not near a fence. The next set of poles is three in number with a 29-foot crossarm and is located in tillable soil but on what is a present fence line. The appellee, Miller, states that this fence could easily be moved so that the land surrounding the three pole station could be cultivated. He stated that it had never been cultivated but that it could be and that he wanted to do so. The last two poles to the south are set out in the field 15 feet west of the appellee Miller's east line fence. There are no guy wires on the two pole structures but there are four on the three pole structure. One of the guy wires extends 65 feet southwest from the poles and not within the 100 foot width. There are three main transmission lines carried on these poles with a voltage of 115,000 volts.

In the course of the erection of the poles of the appellant it is shown that approximately twenty trees of varying sizes were cut down and up-rooted. Miller, the appellee, had used a portion of this land for pasture purposes and it is claimed that by the loss of these trees shade was not as easily afforded the stock and at a point distant from the residence properties. It is Miller's claim that he will not be able to cultivate a space 25 by 25 feet adjacent to the two pole structure in the field. He also contends that around the three pole structure there would be a space 70 by 30 feet that could not be cultivated. It is also claimed that with these poles in the field the ground could not be advantageously farmed with power machinery and some damage would result to the growing crops because of the difficulty in cultivating around the poles.

It is shown that the appellee and his wife purchased the 220 acres of land from the Union Central Life Insurance Company in 1936 for $106 per acre. There are two residence properties on the 140-acre tract a short distance east of paved Highway No. 14. One of these residence properties, a six-room structure, is occupied by Miller and his wife. It has been thoroughly modernized since its purchase. Near this residence is a seven-room modern structure occupied by a son of the Millers.

It is disclosed by the evidence that on frequent occasions the land through which the condemned strip was taken is flooded during the spring. This land is termed bottom land and is near the Iowa river but does not border it. It is shown by Miller's testimony that despite the flooding of the land he has always been able to later plant and produce a satisfactory crop on it.

The appellee, Miller, placed a valuation of $210 per acre on his entire farm prior to the condemnation proceedings and $175 per acre after the condemnation. He claimed he was damaged in the amount of $7700. One of the witnesses for Miller placed a valuation of $250 per acre upon the entire farm prior to the condemnation and $225 per acre after it. The resulting damage based on these figures would be $5500. Another witness placed a valuation of $175 to $180 per acre on the farm before the condemnation and a valuation of $150 per acre after the condemnation. Based upon a $30 an acre damage the resulting damage would be $6600. A further witness placed the valuation at approximately $210 per acre prior to the condemnation and a valuation of from $180 to $185 per acre after it. Considering this witness's maximum valuations there would be a damage of $25 per acre or a total damage to the entire farm of $5500. Another witness placed a valuation of $225 per acre on the entire farm before the condemnation and $200 per acre after the condemnation which would result in a damage to the entire farm of $5500.

One of the valuation witnesses called by the appellant placed a valuation on the entire farm at $115 per acre before the condemnation and stated that there would be no difference in valuation after the condemnation. Another witness placed the same valuation upon the property as did the first witness. A further witness placed a valuation of $125 per acre before the

condemnation and the same valuation after the condemnation. Another witness valued the land at $100 per acre before the condemnation and the same valuation after it and the last witness placed a valuation of $125 per acre before the condemnation and the same valuation after this proceeding. It will be observed that none of the appellant's valuation witnesses stated there was any damage resulting to the property by reason of the running of this high voltage line through the farm and the erection of the several poles at four different points.

During the course of the cross-examination of Sheldon O. Miller, one of the appellees, a question was asked to which an objection was made. The record relative to the question, the objection, and the court's ruling is, in part, here set out:

"Q. I will ask you to state whether or not, Mr. Miller, you and your wife, Lanor T. Miller, signed an instrument during the early part of 1947 whereby, as far as you were concerned, you gave the Iowa Electric Light and Power Company an easement over this farm for a 36 foot right-of-way at a figure of approximately $300.00? * * *

"Mr. Tye: (In absence of the jury) * * * This is objected to for the reason it is wholly incompetent under the issues in this case. It is an attempt on the part of the defendant, Iowa Electric Light and Power Company, through their attorneys, to inject into the evidence before the jury an attempted compromise which they know was concerning an entirely different transaction, which they know involved only a question of 36 feet, and question of a different location of the line and under which there were more than one party involved, and the Union Life Insurance Company not being in any manner involved in, agreeing to or consenting to it. It would open up then a question of the amount of pressure and intimidation, and force and circumstances under which it is claimed that this proposed compromise was given or issued. It would be highly prejudicial to Mr. Miller and to the Union Central Life Insurance Company, plaintiffs in this case, and incompetent, and to the wife of this plaintiff.

"Mr. Cartwright: Add this to my question: Q. (Con't.) The right of way contained in such easement being the same as involved in this case with the exception of the width.

"Mr. Cartwright: It may be understood, Mr. Tye, your objection applies to the question as amended. I will say for the benefit of the record, the reason for the condemnation of the land was, the title to the land was in the Union Central Life Insurance Company. The Union Central Life Insurance Company would not join in the option agreement. It was for that reason the condemnation was had.

"The Court: This question is calling for the conclusion and opinion of the witness as to what he did,, as far as that is concerned. There isn't before the court right now any paper, or any signed instrument. I have no way of knowing anything more than the interrogatory states, which presupposes that there is something that was signed. * * *

"The Court: There are three parties to the transaction. It was necessary that all three should come to terms in order that this option—

"Mr. Cartwright: We could have elected to obtain a separate agreement with the Union, if desired.

"The Court: But you didn't.

"Mr. Cartwright: But we didn't. But as far as the option agreement is concerned between the Millers and the Iowa Electric Light and Power Company, it is complete.

"Mr. Tye: That wasn't completed. This is an entirely different option. This contains 100 feet. They ask in that 36 feet. It isn't competent to show the value of a 36 foot strip, and the easement here asks for a 100 foot strip. It wouldn't be competent.

"Mr. Cartwright: I think the poles would still be located the same.

"Mr. Tye: That is another thing.

"The Court: Frankly, the court can't see where it is admissible. He hasn't been convinced by the things said. I think that the objection should be sustained and is sustained. Defendants except."

The appellants present two propositions for reversal. They are: (1) That the verdict of the jury was excessive and the result of passion and prejudice, and (2), that the lower court erred in refusing to permit the appellant to show by cross-

examination of the appellee Miller that he had, prior to the condemnation, agreed on a damage valuation of $325 for a right-of-way across the land.

██ ██ I. Where there is a disputed fact question as to the value of the property taken by eminent domain and there is competent evidence from which the jury could reach the verdict it did this court will not interfere. Cutler v. State, 224 Iowa 686, 691, 278 N. W. 327, 329. It is also the adopted rule of this court that unless the amount found by the jury is shown to be so extravagant as to be wholly unfair and unreasonable this court will not interfere with the verdict of the jury and set it aside. Longstreet v. Town of Sharon, 200 Iowa 723, 727, 205 N. W. 343, and cases cited. See also Stoner v. Iowa State Highway Comm., 227 Iowa 115, 121, 287 N. W. 269; Evans v. Iowa Southern Utilities Co., 205 Iowa 283, 290, 218 N. W. 66; Korf v. Fleming, 239 Iowa 501, 523, 32 N. W. 2d 85, 97, and cases cited.

██ In the instant case there was evidence presented on the part of the appellees that the damage to the value of the entire farm by reason of this condemnation proceedings and the erection of the transmission line varied from $5500 to $7700. On the other hand the valuation witnesses who testified for the appellant all state there was no difference in the valuation of the farm after the condemnation proceedings and the erection of the transmission line. The witnesses for both the appellees and appellant could and undoubtedly did take into consideration the fact that this transmission line carried a voltage of 115,000 volts, that the granting of a franchise to construct the line over the property of the appellees resulted in a continuing easement or right which would affect the title to the property, that the farm had two well-built farmhouses and adequate and well-built farm buildings, that there would be resulting inconvenience in farming the land adjacent to the poles and that a certain number of trees were necessarily removed so as to make possible the erection of the transmission line. All these facts were brought out in the evidence presented to the jury. We have given consideration to the case of Luthi v. Iowa State Highway Comm., 224 Iowa 678, 683, 276 N. W. 586. The holding of prejudice in that case is not applicable to the evidence here

presented. Under the record made before the trial court and the authorities previously cited we hold there is no showing of prejudice and passion and that it was properly within the province of the jury to return the verdict that it did.

■ II. The appellant contends, as a further ground for reversal, that the trial court erred in not permitting it to show by cross-examination of Miller that he had early in 1947 signed an agreement of proposed settlement or sale wherein it was agreed he would grant to the appellant the right to erect a transmission line through the farm in question. This agreement was not in evidence and the record as heretofore quoted discloses how this issue arose. It is the contention of the appellant that its subsequent offer of testimony as to this transaction was erroneously overruled as an admission against interest on the part of the witness, Miller, and for the further reason that it had the right to cross-examine him relative to it as bearing upon his credibility. It is the claim of the appellee that this alleged offer of sale was in the nature of a compromise offer of settlement of a controversy and that as a compromise offer it was not admissible.

The exhibits introduced disclose that on the 23rd of August, 1946 the appellant company filed in the office of the Iowa State Commerce Commission an application for a franchise to construct a transmission line through the property of the appellees. The franchise authorization given by the Commission was dated September 24, 1946. It is the claim of the appellant that this offer of sale made by the Millers was during the early part of 1947. A further exhibit was a certificate of the Iowa State Commerce Commission showing that on May 2, 1947 the appellant herein sought authority under its previously granted franchise to institute condemnation proceedings against the appellees. It is further shown by this certificate that such authority was given on May 12, 1947. We are therefore presented with the question whether there was a controversy in existence at the time of the claimed offer of sale and that the execution of the claimed instrument was for the purpose of settling a controversy between the parties.

■ Although the claimed agreement for sale on the part of Millers may have been made we hold that under the record it

was in the nature of a compromise settlement of a controversy and therefore not admissible. As heretofore set forth the company had been given franchise authority to construct a transmission line through the appellees' property prior to the execution of the claimed agreement for sale. It is a matter of general knowledge that the only way in which a right to construct such a line could be obtained is by outright purchase and settlement or by condemnation. In the case of Chicago, S. F. & C. Ry. Co. v. McGrew, 104 Mo. 282, 298, 15 S. W. 931, 935, the Missouri court commented upon a situation somewhat similar to the question here presented. Apparently under a statute an effort to agree to a settlement was a condition precedent before actual condemnation proceedings could be had. In this cited case the court stated:

"* * * Efforts to agree, which were required to be made before legal proceedings could be instituted, having failed, all previous negotiations or offers were at an end, and could only be viewed in the light of efforts to compromise, and evidence of their character and extent was not admissible. Plaintiff had no more right to tender, or to prove that he had tendered, defendant certain privileges, than the defendant had to offer to donate, or prove that he had offered to donate, the right of way if a different location should be adopted. [Citing cases.]"

See also St. Louis & K. C. Ry. Co. v. Eby, 152 Mo. 606, 54 S. W. 472, 473.

A similar statute to that in Missouri apparently exists in Indiana. In commenting upon the claimed offer of settlement the Indiana court in the case of Indianapolis Northern Traction Co. v. Dunn, 37 Ind. App. 248, 253, 76 N. E. 269, 271, stated:

"A failure to agree with the landowner as to the compensation for the land sought to be appropriated was a condition precedent to any standing in court by the petitioner. As it was a fact essential to the petition to condemn, it was necessary to show that there had been a failure to agree. But we fail to see any reason for any distinction between an offer made by the landowner in the effort to agree and an offer made before suit for the purpose of compromising a claim, in so far as the offer was to be considered an admission by the landowner. And that

was the purpose for which it was here sought to be used. The same reasoning that excludes an offer to compromise as an admission will exclude an offer made by the landowner for the purpose of agreeing upon the compensation to be paid. An offer made to avoid controversy and to save the expense of vexatious litigation cannot properly be called an admission. See West v. Smith (1879), 101 U. S. 263, 25 L. Ed. 809."

In Yonts v. Public Service Co., 179 Ark. 695, 698, 17 S. W. 2d 886, 887, it is stated:

"* * * A company condemning land might be willing to give more than it was worth and the owner of land might be willing to take less than it is worth, that is, less than its market value, rather than have a lawsuit. Moreover, when a company seeks to get land or condemn it for public uses, having the power to condemn, the landowner would probably come to some agreement with him rather than have a lawsuit, and this agreement would show a compromise rather than the market value of the land."

It is also stated in 18 Am. Jur., Eminent Domain, 993, section 349, as follows:

"In general, offers of sale made by the owner, and other admissions as to the value of his property and the amount of his damages, are competent evidence against him, if sufficiently near the time of the taking to be of service to the jury, and if not made as part of an attempt to compromise. But an offer by the owner to sell at a certain price, to be admissible against him, must have been made for the purpose of a voluntary sale. * * *"

We have uniformly held that an offer of compromise is inadmissible. Lynch v. Egypt Coal Co., 190 Iowa 1272, 1278, 181 N. W. 385, and cases cited.

One of appellees' objections to the above offer of proof by appellant is that the statement claimed to have been made by Miller was in writing and the writing would be the best evidence. In view of our holding that the statement was an offer to compromise an existing controversy we need not determine whether

the objection based on the parol evidence rule was good. We may observe, however, there would seem to be merit in this contention of appellees.—Affirmed.

All JUSTICES concur.