JERRY SANDMAN, appellant, v. WILLIAM V. HAGAN and CHARLES A. STRIEGEL, d/b/a BEANE PLUMBING AND HEATING Co. et al., appellees; ANDREW MONTAGNE, cross-appellant.

No. 52709.

(Reported in 154 N.W.2d 113)

November 14, 1967.

Rehearing Denied January 8, 1968.

Runge & Runge, of Sioux City, for appellant.

E. L. Moran and Shull, Marshall, Marks & Vizintos, all of Sioux City, for appellees William V. Hagan and Charles A. Striegel, d/b/a Beane Plumbing and Heating Co.

Harry H. Smith, of Sioux City, for appellee and cross-appellant Andrew Montagne.

LARSON, J.—It appears from the record that on November 7, 1963, the plaintiff, Jerry Sandman, employed by the Sioux City Sewer Department, was directed to inspect a job at 2213 Pierce Street in Sioux City, Iowa, and arrived on the job between 8 and 9 a.m. His duty that particular morning was to inspect the installation, the hookup, and the backfill of a connection to the city water system being done by Beane Plumbing and Heating Co., hereinafter referred to as the employer. The defendant Montagne and two other employees of Beane Plumbing and Heating Co., Lloyd Brunssen and Martin Wilde, were doing the actual work. A hole had been dug in the street approximately three to four feet wide, five feet long and six feet deep. The installation and hookup had been completed and the backfill operation involving the refilling of the hole was awaiting the arrival of Sandman. In this operation a small quantity of dirt is first dumped into the excavation and then this dirt must be firmly tamped beneath the water pipe and main. This process is repeated until there is sufficient dirt under the pipe and main so that there is no gap between the dirt and the main. If a gap is present, in time this could cause the water main to come apart and undermine and wash out the pavement. Inspector Sandman was there to see that the dirt was properly compacted under the main by the installing workmen. At the time of this incident defendant Montagne was on the street helping scoop dirt into the hole with a hand shovel. Lloyd Brunssen was in the hole

spreading the dirt and tamping it under the pipes, and Martin Wilde was on the street near the hole attending his front-end loader tractor. An air compressor nearby that powered a pneumatic tamper was running during this time, which made it difficult to hear conversations in the area.

Sandman testified he was observing the backfill operation from above when he noticed that dirt had not been properly compacted under the main, and he brought this to the attention of Brunssen. Not being satisfied with the results of his directions, he jumped down in the hole to show Brunssen that there was a void under the main.

Brunssen testified that Sandman had said nothing to him about improper backfilling, but rather jumped into the hole with him and began shoving dirt into a gap under the main. Both testified that no altercation or abusive language occurred until Sandman had demonstrated to Brunssen that there was indeed a gap between the main and the ground. At this point Sandman testified that Brunssen called him a s.o.b. and other derogatory names, told him to get out of the hole, and said he had no business down there. Brunssen admitted that he reprimanded Sandman for using the employer's tools and testified that Sandman said he could use them anytime he wanted to and that if Brunssen did not like it he could take it up with the labor union at the city hall.

Immediately following this name-calling, a fight took place between Sandman and Brunssen. Sandman testified that to the best of his recollection he struck Brunssen only once and that the fight lasted about two minutes. Brunssen testified that he did not strike Sandman, but doubled up to protect himself and that Sandman struck him several times on the face and body, and that the fight lasted about 15 to 30 seconds.

Montagne testified that he did not hear the conversation between Sandman and Brunssen prior to the fight because the noisy air compressor was running at the time, that the first thing he knew Sandman was pounding on Brunssen and he yelled at Sandman to stop but that he did not stop, and that he (Montagne) became scared that Brunssen might be hurt. Montagne then struck Sandman on the back of the head with a shovel. Although Sandman testified he saw Montagne swing the shovel

at him, he did not hear Montagne say anything to him before he got hit with the shovel.

Martin Wilde testified that he saw Sandman striking Brunssen about the head and neck, that this lasted about 10 or 15 seconds, and that while Sandman was striking Brunssen he heard Montagne yell at Sandman to stop. He also said Sandman then looked up at Montagne and called him a s.o.b. and asked him if he wanted some too. It was then that Montagne struck Sandman with the shovel. Both Montagne and Wilde testified that Sandman was bleeding immediately after the blow. Wilde described the blow that struck Sandman as not a sideswipe but said the shovel came straight down a distance of two and a half to three feet and struck Sandman, whose head was a few inches below the pavement level. Montagne, however, said the blow came from the side and that the shovel could have been raised above his shoulder.

Brunssen testified that he was not aware until later that Montagne had struck Sandman with the shovel and, when he noticed that Sandman was bleeding, he thought it was because Sandman had struck his head on the concrete around the hole.

After he was struck with the shovel, Sandman climbed out of the hole and said he asked for help and that the employees told him there was a phone booth on Twentieth and Pierce. Brunssen testified that Sandman did not ask for help, but walked off down the street without saying a word to anyone.

It further appears there was a dispute between Sandman and Montagne over another backfill job two weeks before, in the presence of the employer's foreman. At that time Sandman said Montagne picked up a shovel and gave it a toss and it careened off the tires of a machine some distance away. The alarmed foreman asked what was the matter, retrieved the shovel, and proceeded to do the work of tamping himself.

At the close of plaintiff's evidence the trial court denied motions for a directed verdict by both defendants. The jury returned a verdict for Sandman against all defendants. On motion by the employer, the trial court granted judgment notwithstanding the verdict for it, concluding there was insufficient evidence to sustain a finding that Montagne was acting within the scope

of his employment. The trial court denied Montagne's motion for a new trial based upon his claim of insufficient evidence to sustain a verdict in the sum allowed and prejudicial errors in trial procedure. Plaintiff appeals from the granting of the employer's motion, and the employee cross-appeals.

The sole issue presented on appeal by appellant Sandman is whether at the time in question employee Montagne was acting within the scope of his apparent authority so as to make the defendant employer liable and sustain the jury determination on that issue.

The trial court concluded there was no evidence to sustain a finding that Montagne's authority extended beyond that of putting in waterlines and refilling excavations, or that his duties contemplated conflict with others, or that the assault was done in the furtherance of the employer's business or interests within the scope of his employment. We must agree.

■ I. It is well established in Iowa that under the common law the master and servant may each and both be liable for a servant's torts committed within the course of employment. Graham v. Worthington, 259 Iowa 845, 866, 146 N.W.2d 626, 640; Montanick v. McMillin, 225 Iowa 442, 452-459, 280 N.W. 608; Hobbs v. Illinois Cent. R. Co., 171 Iowa 624, 152 N.W. 40, L.R.A. 1917E 1023.

The difficulty encountered by various courts in cases of willful torts committed by servants has resulted in irreconcilable decisions, and, unless carefully scrutinized, the authorities seem to be in hopeless confusion. See 34 A.L.R.2d 367 for list of many cases. The difficulty is in defining and applying the concept of acts within the course of employment or the scope of the servant's authority. These terms are often used loosely and not carefully analyzed. Even the text writers seem to have trouble relating the servant's duty and authority to scope of employment and, due to various decisions, use the words, "implied," "apparent" and "actual authority" to expand or diminish the duty of the servant upon which liability rests when courts seek evidence as to whether the tort was committed in the furtherance of the employer's business or interests.

It has been said an act is "within the scope of the servant's employment" where such act is necessary to accomplish the

purpose of the employment and is intended for such purpose, although in excess of the powers actually conferred on the servant by the master. Wood v. Southeastern Greyhound Lines, 302 Ky. 110, 194 S.W.2d 81. As bearing thereon see Dougherty v. Chicago, M. & St. P. R. Co., 137 Iowa 257, 114 N.W. 902, 14 L.R.A., N.S., 590, 126 Am. St. Rep. 282. Also, for other definitions, see Words and Phrases, Permanent Edition, and 34 A.L.R.2d 367.

It is safe to say that "within the scope of the employment" requires that the conduct complained of must be of the same general nature as that authorized or incidental to the conduct authorized. Maddex v. Ricca, 258 F. Supp. 352; Plotkin v. Northland Transp. Co., 204 Minn. 422, 283 N.W. 758. The facts in the Kentucky Wood case and the Minnesota Plotkin case are not greatly different. Both result in no employer liability. In each case, after an altercation with another vehicle on the highway, the bus company driver stopped his bus and assaulted the operator of the other vehicle. Both courts recognize the rule that to determine whether an agent's act is within the scope of employment so as to make the master liable therefor, the question is whether the agent's conduct is so unlike that authorized that it is "substantially different." Both state that, to render a master liable for a servant's battery, it is not sufficient that the battery is due to anger arising from the performance of the servant's duties. Consideration was also given therein to the claim that such driver action was employment-related because the employer's business was to keep the bus on schedule, but this was not deemed sufficient.

II. Generally speaking, an employer is responsible to third persons for his servants' tortious acts if committed while the servant is engaged in furthering the employer's business or interests within the scope of his employment, but absent nondelegable duty, such as that imposed by the relationship of carrier and passenger or hotel and guest, the servant's battery does not make the employer liable unless the employment is of such nature that it is likely to bring the servant into conflict with others. Wood v. Southeastern Greyhound Lines and Plotkin v. Northland Transp. Co., both supra; Annotation, 34 A.L.R. 2d 367; Restatement of Agency, § 245, Comment a, page 548.

The case at bar obviously does not fall within the class of carrier and passengers or hotels and guests. There is no dispute as to the duties of the employee Montagne or his authority over others. He testified his duties were to "put in waterlines, dig and fill ditches." He worked on the outside crew as a laborer and was under the supervision of a foreman. He had done this work for about seven years. There was no evidence that he exercised any authority over others, and there was nothing shown to indicate that the nature of this employment was likely to bring him into conflict with others.

The facts as to the assault are not in substantial dispute. Montagne struck Sandman on the head with his shovel and pleaded guilty to an assault charge. Although the assault was made on the jobsite while the employee was employed at a task for his employer, this is not enough to make a master liable for a battery by his servant, nor is it sufficient to show the battery would not have occurred except for the employment. The employment must be something more than the mere occasion for the fracas. Plotkin v. Northland Transp. Co., supra; 2 Mechem, Agency (Second Ed., 1914), Section 1978; 35 Am. Jur., Master and Servant, Section 55.

As we have pointed out, a deviation from the employer's business or interest to pursue the employee's own business or interest must be *substantial in nature* to relieve the employer from liability. Hoblit v. Schnepf, 229 Iowa 1085, 296 N.W. 210; Orris v. Tolerton & Warfield Co., 201 Iowa 1344, 207 N.W. 365; Wood v. Southeastern Greyhound Lines, supra. Here, the employer contends the assault was clearly a deviation substantial in nature, for under no theory advanced would the duty of installing waterlines and digging ditches include the exercise of force upon others. It is difficult to see how his employer's business or interest would ever be furthered by such an employee attack, especially on an inspector. The trial court found nothing was shown to sustain a finding that the act of defendant Montagne was anything his employment contemplated or was something which, if he would do lawfully, he might do in his employer's name. We agree. Of course, a deviation need not be of long duration in order to relieve the employer of liability if the deviation is substantial in nature. Seybold v. Eisle, 154

Iowa 128, 134 N.W. 578, Ann. Cas. 1914A 1097; Morier v. St. Paul, M. & M. Ry. Co., 31 Minn. 351, 17 N.W. 952, 47 Am. Rep. 793; Maddex v. Ricca, supra, 258 F. Supp. 352 (1966), and citations.

Although the question of whether an act is within the scope of employment is ordinarily a jury question, depending on the surrounding facts and circumstances, the question as to whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court. State ex rel. Gosselin v. Trimble, 328 Mo. 760, 41 S.W.2d 801; Novick v. Gouldsberry, 9 Cir., 12 Alaska 267, 173 F.2d 496. This is such a case.

III. We are aware of the so-called modern trend to find liability in this class of cases on the basis that such wrongs are committed by the employee only because of the employment situation, and that since the employer has the benefit of the enterprise as between two innocent third parties, he is better able to bear the risk of loss. If he cannot altogether avoid such wrongs, he can at least minimize them. In those cases it is argued that a general sense of fairness requires that the employer, as the person interested and benefited by the business, rather than the persons who have no concern in or control over it, should bear the burden of such wrongs as incidental to such business. See Penas v. Chicago, M. & St. P. Ry. Co., 112 Minn. 203, 127 N.W. 926, 30 L.R.A, N.S., 627, 140 Am. St. Rep. 470; Harper, Torts, Section 291, page 640; 45 Harvard Law Review 342. If employer liability is to be extended this far, we believe it should come from the legislature, and do not find that this concept has substantial support in judicial decisions.

IV. We are satisfied here that the employee Montagne's assault on Inspector Sandman was a substantial deviation from his duties, that his act was substantially different in nature from that authorized by the employer, and that at the time thereof he was acting outside the scope of his employment. The trial court was correct in granting the employer's motion for judgment notwithstanding the verdict and must be affirmed on appellant Sandman's appeal.

V. On cross-appeal defendant Montagne contends the trial court erred in denying his motion for directed verdict and his

motion for a new trial. He relies on the following propositions for reversal: (1) that he was privileged to use reasonable force to come to the defense of Brunssen as a matter of law; (2) that counsel for the plaintiff ignored admonitions of the trial court placing before the jury prejudicial evidence of a compromised offer of settlement; (3) that the trial court permitted jury consideration of medical expenses for which there was no evidence of materiality or necessity. We find no merit in any of these contentions.

It is well established in Iowa that a person is privileged to come to the defense of another about to be injured. Section 691.3 of the Code states: "Any other person, in aid or defense of the person about to be injured, may make resistance sufficient to prevent the same." However, this section must be read in connection with section 691.1, which states: "Lawful resistance to the commission of a public offense may be made by the party about to be injured, or by others." The import of these two sections is to give a third party the right to come to the aid of another; but in doing so he must use lawful resistance. Lawful resistance, or self-defense, is tested by whether the force used to repel the attack was reasonable. Once the force used becomes unreasonable, the privilege ceases. Moran v. Martinson, 164 Iowa 712, 146 N.W. 841; Ward v. Marks, 193 Iowa 171, 185 N.W. 37; Main v. Ellsworth, 237 Iowa 970, 23 N.W.2d 429.

In coming to the defense of another, a person may do only what the person attacked may have done to protect himself. People v. Forte, 269 Ill. 505, 110 N.E. 47, L.R.A. 1916B, 924; Prosser, Law of Torts, Third Ed., page 114; 6 Am. Jur.2d, Assault and Battery, section 152; Restatement of Torts 2d, section 76.

Whether the force used was reasonable is generally a jury question, and the jury's conclusion will be sustained if there is any substantial evidence to support it. Wessman v. Sundholm, 228 Iowa 344, 291 N.W. 137; Lawyer v. Stansell, 217 Iowa 111, 250 N.W. 887.

In the case at bar we are faced with the question of whether defendant Montagne was privileged to strike Sandman with a shovel to protect Brunssen under the circumstances. Cross-appellant argues that he did not use excessive force. He

contends that as he was a man of 63 years he was no match for 29-year-old Sandman in a fistfight, and further, that because he was above the hole he could not intervene using only his hands, and that hitting Sandman with the shovel was the only reasonable alternative remaining. The jury did so find. Although the relative age and strength of the parties is recognized under some circumstances as a justification for using force that might not ordinarily be used, under the facts disclosed here we cannot as a matter of law so hold in this case.

There is no evidence in the record that Montagne was physically disabled in any way. On the contrary, it appears that for a man of 63 years he was in excellent condition. He had been working for quite some time for his employer, and his work would be considered physically strenuous. It appears that he was performing the same tasks as Brunssen, i.e., climbing in and out of ditches and holes, tamping and digging. It does not appear the shovel was the only reasonable method to stop the fight. The jury so found, and there was no objection to the court's instruction on this issue.

In any event, we conclude that the reasonableness of the force used here was a jury question and the evidence is sufficient to sustain its finding that the force used was unreasonable under the circumstances.

VI. Cross-appellant Montagne contends the court should have granted a mistrial when plaintiff's counsel asked the following question: "And, Mr. Striegel, did you make an offer to pay the expenses, hospital expenses of Mr. Sandman and wages of Mr. Sandman while he was in the hospital?" He argues his motion for a new trial should have been sustained because counsel for plaintiff ignored admonitions of the trial court and prejudicially placed before the jury a compromise offer of settlement. This, he says, prevented him from having a fair trial.

The trial court recognized the rule that an offer of compromise is inadmissible, citing Lynch v. Egypt Coal Co., 190 Iowa 1272, 181 N.W. 385, and Miller v. Iowa Electric Light & Power Co., 239 Iowa 1257, 34 N.W.2d 627, but in its conclusions said that, although the question was objectionable and prejudicial

to the employer's defense, it did not require a new trial as to defendant Montagne.

The trial court has considerable discretion in determining whether the alleged misconduct of counsel was so prejudicial as to require a new trial. Nicholson v. City of Des Moines, 246 Iowa 318, 329, 67 N.W.2d 533, and citation. In Hammer v. Janowitz, 131 Iowa 20, 25, 26, 108 N.W. 109, a case in point, this court said: "It was his right to offer the testimony, if he believed it admissible, and to preserve a record of his offer and exception. Had he contumaciously persisted in trying to get the matter before the jury, and thus override the ruling against him, we might well feel justified in regarding it as prejudicial misconduct. State v. Roscum, 119 Iowa 330. But we see nothing in the record to indicate that the offer was not made in good faith, nor can we presume that appellant was or could have been prejudiced thereby." It further observed, "if the fact of offering incompetent or immaterial testimony, which is excluded, is to be held a cause for granting a new trial, few, if any, verdicts could stand the test of such rule." Reference was also made to the case of Maland v. Tesdall, 232 Iowa 959, 5 N.W.2d 327, which considered a like contention. However, there it clearly appeared a prejudicial course of examination was pursued. Incompetent questions which assumed the existence of damaging facts were frequently asked, in spite of repeated objections. Nevertheless, this court concluded the conduct of counsel for appellee was the result of zeal for his client's cause and not any intentional wrong. Also see Tilghman v. Chicago & N.W. Ry. Co., 253 Iowa 1339, 115 N.W.2d 165, which held the trial court's discretion on such matters will not be disturbed unless it appears a different result could have been reasonably possible but for such counsel conduct.

In the instant case, as the court said, there was no indication the verdict was excessive in view of the injuries shown, and we are satisfied the verdict reflected no prejudice due to the question regarding an offer by Striegel to pay Sandman's hospital expenses and wages resulting from the assault.

The record discloses that Mr. Striegel, one of the owners of the Beane Plumbing and Heating Co., was asked a question regarding a visit at the hospital where the matter "regarding

wages and hospital expenses for Mr. Sandman" was discussed. An objection to that question as being "leading and suggestive" was sustained. After being asked if he attended a meeting where a Mr. Samore, Mr. Soper of the city, and Mr. Bodine, were present, the witness said he talked with Mr. Soper quite often about the Sandman incident. Thereafter, the objected-to question, as to whether he had offered to pay expenses, was asked and the court sustained the objection as incompetent, irrelevant and immaterial. At that time defendant-employer's counsel, outside the presence of the jury, moved the court for a mistrial, contending plaintiff's counsel deliberately tried to present evidence of an offer of compromise to the jury. The defendant-employee's counsel joined in this motion and, after oral arguments, the trial court overruled the motion. It found there was no repetition of the objectionable question, held the answer was inadmissible, and admonished counsel not to ask any further questions regarding the matter. Thereafter an offer outside the jury's presence was made by plaintiff as to the answer. This was refused, and no further reference was made thereto.

We find no fault with these rulings by the court and conclude this record does not disclose prejudicial conduct on the part of plaintiff's counsel as to require a new trial or prevent defendant Montagne from receiving a fair trial.

VII. In his final assignment cross-appellant contends the court erred in giving Instruction No. 15 in that it included as damages expenses other than Doctor Blume's bill of $365, Doctor Erickson's bill of $260, the first St. Joseph Mercy Hospital bill of $217.20, and the Mayo Clinic bill of $329. He points out that proper and timely objection was made to the court in this regard, and asserts the only stipulation as to the medical bills was as follows: "That if competent witnesses were called to testify in this case that they would testify that the following doctor bills, hospital bills, ambulance bills and drug bills incurred by the plaintiff herein, Mr. Jerry Sandman, from November 7, 1963, were reasonable charges for the services rendered in this community: [bills listed]." He further asserts there was no stipulation as to the materiality and necessity of these expenses, and contends the plaintiff failed to show the necessary causal

connection between the injury and the damages and expenses incurred as a result thereof.

It is true the evidence must sufficiently establish the causal connection between the injury and the medical expenses claimed as a result of the injury. Specifically, he seems to argue that plaintiff's alleged serious and disabling headaches, for which he received subsequent medical and hospital treatment, were not sufficiently connected to the injury to establish defendant liability beyond the items above conceded. He relies upon the testimony of Doctor Brannick, of the Mayo Clinic, and Doctor Thomas, who he says testified that any three causal factors could have produced Sandman's problems. In an attempt to get Doctor Brannick to attribute plaintiff's headaches and related ailments to the fight in the ditch, being called bad names, as well as to the blow on his head with the shovel, the doctor said: "My opinion is that getting hit on the head was the thing that did it to him, but I can't state with certainty this is the case." He admitted the other causes were possible. Doctor Thomas testified headaches such as plaintiff complains of could have been caused by a blow on the head, and it is not possible to say how much was due to the trauma and how much was emotional. He did say there was a probability of damage to the olfactory nerve and that the headaches resulted from the blow on his head. Sandman contends the additional hospital and medical expenses were incurred in an effort to get relief from these alleged ailments.

We have carefully reviewed the testimony of these doctors and are satisfied the trial court correctly submitted this question to the jury. The probability of the relationship was adequately established. It is the generally accepted rule that where it is certain damage has resulted, uncertainty as to the extent or to the amount will not preclude recovery. There must be some evidence from which a jury may make its determination, but this need not be so definite as to be capable of exact computation. Nicholson v. City of Des Moines, supra, 246 Iowa 318, 327, 67 N.W.2d 533. We believe the testimony of the doctors was sufficient to sustain a jury finding that the medical care furnished was necessary and proper and a result of the assault by defendant Montagne.

Having found no basis for reversal, the judgment of the trial court must be affirmed.—Affirmed.

SNELL, MOORE, STUART and LEGRAND, JJ., concur.

BECKER, J., GARFIELD, C. J., and MASON, J., dissent.

RAWLINGS, J., takes no part.

BECKER, J.—I dissent as to plaintiff's appeal from judgment in favor of defendant employer.

Thompson-Starrett Co. v. Heinold (1932, C.A. 3d Pa.) 60 F.2d 360, involves a situation where an employee hit the employee of a subcontractor with a lead pipe when the plaintiff did not move his equipment as ordered. "It is undisputed that in the early cases a master was held not liable for the tortious act of his servant, when the act was wanton and malicious. In later cases, the master is held liable for the wrongful act of the servant, notwithstanding its wanton and malicious character, if the act was done in the course and within the scope of his employment, and the determination of the question whether the tort was committed while the servant was acting in the course and within the scope of his employment is for the jury."

The foregoing statement is a short summation of the law as it has developed in the past thirty years. Standing alone the case would not necessarily persuade. But a careful reading of the very authorities cited by the majority, i.e., Restatement, Second, Agency, section 245, Comment a (as amended by the Appendix, Restatement, Second, Agency, section 245) and annotation 34 A.L.R.2d 372, 396, indicates the rule stated in Thompson-Starrett Co. v. Heinold, supra, is the majority view. It should be followed by this court. See also annotation 20 A.L.R.2d 868, 911, 912.

The change in Restatement, Second, Agency, section 245, as indicated in the Appendix written twenty-three years later should be especially noted because the change is substantial and weakens the authority upon which the majority relies. At page 389 the author of the Appendix states: "It is believed that it is now desirable to state a rule invoking a somewhat greater liability because of the cases in the intervening years. The courts of some states are more conservative in subjecting the master to

liability than those of other states, but the tendency of the courts is to broaden the area within which the principal is found liable." The author then carefully reviews the history of the development of the doctrine and cites numerous cases supporting his conclusion.

There are so many cases reaching divergent results that this matter should be determined by the broad general principles as they have developed in this field. In Carr v. William C. Crowell Co. (1946), 28 Cal.2d 652, 655, 656, 171 P.2d 5, 7, 8, Traynor, J., analyzes the problem in a closely analogous case and sets forth several principles that should govern our consideration here:

"The employer's responsibility for the tortious conduct of his employee 'extends far beyond his actual or possible control over the conduct of the servant. It rests on the broader ground that every man who prefers to manage his affairs through others, remains bound to so manage them that third persons are not injured by any breach of legal duty on the part of such others' while acting in the scope of their employment. (Cases cited) In the present case, defendant's enterprise required an association of employees with third parties, attended by the risk that someone might be injured. 'The risks of such associations and conditions were risks of the employment.' Cardozo, J., in Leonbruno v. Champlain Silk Mills, 229 N.Y. 470, 472, 128 N.E. 711, 13 A.L.R. 522. Such associations 'include the faults and derelictions of human beings as well as their virtues and obediences. Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional makeup. In bringing men together, work brings these qualities together, causes frictions between them, creates occasions for lapses into carelessness, and for fun-making and emotional flareup. Work could not go on if men became automatons repressed in every natural expression * * *. These expressions of human nature are incidents inseparable from working together. They involve risks of injury and these risks are inherent in the working environment.' (Cases cited.) * * *

"If an employee inflicts an injury out of personal malice,

not engendered by the employment, the employer is not liable."

It is recognized that plaintiff relies heavily on the foregoing case. It appears to be worthy of his trust—and ours.

The Cardozo citation is borrowed from a case involving workmen's compensation but is applicable to this problem. In fact it underlines the need for growth in the law in concomitant fields.

These principles are in harmony with what has been said in such Iowa cases as St. Peter v. Iowa Telephone Co., 151 Iowa 294, 131 N.W. 2; Nesbit v. Chicago, R.I. & P. Ry. Co., 163 Iowa 39, 143 N.W. 1114; Fagg v. Minneapolis & St. L. R. Co., 175 Iowa 459, 157 N.W. 148.

Such views are also in harmony with what is said in Prosser, Law of Torts, Third Ed., section 69, page 476: "It may be said, in general, that the master is held liable for any intentional tort committed by the servant where its purpose, however misguided, is wholly or in part to further the master's business."

Here the employees' duties regularly brought them in contact with the inspector. The inspector and Montagne had had previous altercations. This fight developed over the method of performing the employer's business of laying the pipe. Montagne entered the fray on the side of the fellow employee, if not on his behalf. It is for the jury to decide whether this employee was acting within the scope of his employment or on a venture of his own. I would affirm as to defendant Montagne but would reverse and reinstate the verdict as to employer-defendants.

GARFIELD, C.J., and MASON, J., join in this dissent.