Clark YEAGER, Appellee,

v.

George O. DURFLINGER, Jr., Appellant.

No. 61838.

Supreme Court of Iowa.

May 30, 1979.

Thomas M. Walter, of Barnes & Walter, Ottumwa, for appellant.

Kenneth L. Keith, of Dull, Keith & Beaver, Ottumwa, for appellee.

Considered by REYNOLDSON, C. J., and LeGRAND, HARRIS, ALLBEE, and LARSON, JJ.

ALLBEE, Justice.

Plaintiff, Clark Yeager, brought this action for breach of an oral contract. That contract, made with defendant, George O. Durflinger, Jr., required that plaintiff purchase cows and keep them on his farm during the winter. Defendant would then purchase the cows from plaintiff in the spring for a guaranteed price.

Defendant was a livestock farmer and buyer, while plaintiff's farming consisted primarily of raising corn and soybeans. The benefit of the contract to defendant was that he would be able to take advantage of cattle prices which were generally significantly higher in the spring than in the prior fall or winter. Plaintiff's advantage lay in the fact that he could winter the cows primarily on cornstalks and other residue left in his cornfields after harvesting and thus receive value for the use of what would otherwise be waste.

The contract which gives rise to this dispute was performed during the winter of 1973–74. This was the third year in which the parties had entered into such an arrangement. While the parties dispute several details, the contract generally provided that plaintiff would purchase cows and winter them in his cornfields. He provided, in addition to the residue left in the field after harvesting, salt and mineral blocks, protein blocks, water, and, on severe winter days when the cattle could not reach the cornstalks through the snow, ground corn. In the spring, defendant was to pay plaintiff the price which plaintiff had paid for the cows plus ten dollars per cow for each month the cows had been kept.

Plaintiff claimed, and defendant denied, that the agreement called for defendant to remove the cows from plaintiff's premises by March 1. There was testimony that the cows had been removed in the first few days of March in the prior years. In addition, plaintiff explained that failure to remove the cows by early March would result in delaying his preparation for planting. He also testified that allowing the cows to remain after the ground began to thaw would result in packing and destruction of the soil structure.

Defendant did not remove the last of the cows until May. His plan had been the victim of a precipitous decline in cattle prices between the fall of 1973 and the spring of 1974. This made it difficult or impossible for him to sell the cows profitably. He, however, attributed his difficulties in selling the cows to their condition, which he described as "getting run down" and "getting thin." He blamed the cows' condition on plaintiff, claiming that the cows had not received adequate care and feed.

Plaintiff, for his part, testified that the cattle had been in good condition on March 1, but that he had begun to run out of cornfields on which the cows could forage and that the cornstalks which remained had begun to rot as the weather warmed up. When the cornstalks ran out, plaintiff fed the cows hay and ground corn, at greater expense. He also called a veterinarian when, in the middle of March, a number of cows contracted leptospirosis. Of nine cows which died while in plaintiff's possession, only two expired before March 1; one of those died because she became stuck in a creek. When the last of the cows were removed in May, they were taken to the farm of defendant's brother, Harry Durflinger.

Plaintiff computed his damages in this manner. The total purchase price of the cows was $126,355. Care of the cows at the agreed rate of ten dollars per cow per month through March 1 amounted to $12,727. Expenses incurred after March 1 totalled $2650.

From the sum of those figures, plaintiff deducted the cost of the two cows which died before March 1 and four cows which plaintiff kept, a subtotal of $2346; the price of cows which plaintiff sold to his neighbors, a subtotal of $3760; and two payments of $14,000 and $75,000 which defendant made, a subtotal of $89,000. Thus, plaintiff computed his damages as being $46,626.

The jury apparently found plaintiff's understanding of the agreement to be the

more accurate and agreed with his computation of damages, because it returned a verdict for him in the amount he demanded. Trial court overruled defendant's motion for a new trial and entered judgment on the verdict. Defendant appealed.

I. The issue which demands our initial attention has been raised by plaintiff's motion to dismiss this appeal. That motion contends that defendant voluntarily paid the judgment and has thus waived any right to appeal.

There is no dispute about the following facts, which appear from affidavits and documents filed with the motion and resistance. After judgment entry, plaintiff took steps to enforce the judgment, including subjecting defendant to a debtor's examination and transcripting the Wapello County judgment into the records in Jefferson County, where defendant owned real estate. In early May 1978, the sheriff of Wapello County levied upon certain of defendant's personal property, including grain, hogs, and cattle.

In order to meet his debts, defendant applied for a loan which was to be secured by a mortgage on his real estate in Jefferson and Wapello Counties, and paid the lender a $10,000 commitment fee which was not refundable if the loan was disapproved. The lender refused to approve the loan unless the judgment lien was removed and, in addition, refused to accept the posting of a supersedeas bond. Finally, plaintiff rejected defendant's suggestion that a fund representing the judgment be placed in escrow in exchange for a release by plaintiff.

Under these circumstances, defendant paid the judgment in full. Plaintiff's counsel drafted, and plaintiff signed, this release:

> In consideration of the Defendant paying in full the judgment and costs in the above-entitled matter voluntarily and with full knowledge of the consequences thereof, undersigned Plaintiff hereby fully satisfies and releases the judgment against the Defendant in the above-entitled matter.

The problem which confronts us is to determine what consequences ought to flow from these uncontroverted facts.

As was said in *Starke v. Horak,* 260 N.W.2d 406, 407 (1977):

> Ordinarily voluntary compliance with a judgment by a party requires dismissal of his appeal. [Citation.] But this court does not have a wooden attitude about dismissal . . . .

The burden to show facts demonstrating a waiver of appellate rights is on plaintiff in this case. *See Millsap v. Cedar Rapids Civil Service Commission,* 249 N.W.2d 679, 683 (Iowa 1977). *Starke* noted several recent decisions which, when taken in sum with *Starke* itself, indicate that this court has become less willing to find a waiver of the right to appeal from compliance with a judgment.

The determination of whether a judgment has been complied with voluntarily, resulting in a waiver, must be answered on a case by case basis. Defendant's compliance in the present case was not voluntary and did not result in a waiver of the right to appeal. The usual means of delaying enforcement of a judgment, the use of a supersedeas bond, was denied to him by his lender. The requirements of the lender and the intransigence of the plaintiff forced defendant to satisfy the judgment or face larger losses. Thus, that satisfaction cannot be termed voluntary within any usual sense of the word. *See Armstrong v. Douglas Park Building Association,* 176 Ill. 298, 301, 52 N.E. 886, 887 (1898); *Lumaghi v. Abt,* 126 Mo.App. 221, 227–28, 103 S.W. 104, 105 (1907); *Favret Co. v. West,* 21 Ohio App.2d 38, 254 N.E.2d 709, 710 (1970). Nor can the recitations of the release, which was drafted and signed by plaintiff, have any binding effect on defendant.

When faced with an essentially similar factual situation in *Hipp v. Crenshaw,* 64 Iowa 404, 20 N.W. 492 (1884), this court found waiver and dismissed the appeal. *Hipp* is not in accord with recent developments in this area. It is therefore overruled.

We deny the motion to dismiss and proceed to consider defendant's appeal on its merits.

II. Defendant first contends that trial court committed error by overruling defendant's motion in limine which called for exclusion of any mention of compromise negotiations, by permitting plaintiff's counsel to refer to such negotiations in his opening statement, by allowing examination of defendant on that topic, and by refusing to grant a mistrial when another witness testified on the subject. This assignment involves four points which we discuss individually.

First, the denial of a motion in limine cannot constitute reversible error. *State v. Garrett*, 183 N.W.2d 652, 655 (Iowa 1971). Instead, review of questions raised by such a motion is dependent upon the making of a proper objection at the time that the allegedly prejudicial evidence is offered. *Twyford v. Weber*, 220 N.W.2d 919, 924 (Iowa 1974).

The second point to be considered focuses upon the comments of plaintiff's counsel in his opening statement. Those remarks, however, made no reference to any offer to compromise. They instead told the jury that plaintiff expected to produce evidence of an admission of fact by defendant. Such an admission is admissible. *Nehring v. Smith*, 243 Iowa 225, 231–34, 49 N.W.2d 831, 835–36 (1951). As the discussion of the next point will demonstrate, plaintiff's counsel apparently made the statement with the good faith belief that he would be able to produce supporting evidence. It was therefore proper. *See Lamp v. Lannegan*, 188 N.W. 982, 984 (Iowa 1922). *See generally* 88 *C.J.S. Trial* § 161, at 315 (1955).

The third point concerns certain questions directed to defendant on cross examination by plaintiff's counsel. The relevant portion of the transcript is this:

Q. Until this lawsuit was filed, didn't you tell Mr. Yeager, on a number. of occasions, that you would pay him the balance of the purchase price and $10 per head per month?

MR. WALTER: Objected to for all the grounds urged in my motion in limine.

THE COURT: Overruled.

MR. KEITH: Read the question again, please.

COURT REPORTER: Question "Until this lawsuit was filed, didn't you tell Mr. Yeager, on a number of occasions, that you would pay him the balance of the purchase price and $10 per head per month?"

THE WITNESS: I can't remember.

MR. KEITH: Didn't you tell other people besides Clark Yeager that?

THE WITNESS: No.

Q. Specifically, didn't you tell Mr. Larsen of the Federal Land Bank that?
A. Not that I can remember.

Q. You could have? It's possible, you just don't remember, is that what you're saying, or are you denying it? A. I can't remember telling him, no.

Once again, there is no mention of any offer to compromise or compromise negotiations. The question refers only to an admission that defendant owed the full contract price. If defendant had answered the question affirmatively, he would have been acknowledging the making of a prior admission: that he owed money to plaintiff on the basis of the contract. *See Hiram Ricker & Sons v. Students International Meditation Society*, 501 F.2d 550, 553 (1st. Cir. 1974); 4 J. Wigmore, *Evidence* § 1061(d) (J. Chadbourn rev. 1972). *See generally McCormick's Handbook of the Law of Evidence* § 274, at 663–64 (2d ed. E. Cleary 1972). No error occurred at this juncture.

Defendant's final complaint regarding evidence of compromise arises out of the following sequence from the examination of Richard Larsen, presented as part of plaintiff's case in rebuttal. Larsen had, just prior to this sequence, testified that he had held two conversations with defendant in which defendant had told about discussions he had with plaintiff regarding this contract.

Q. All right. The conversation within the last [six months], tell us the substance of that conversation, what Mr. Durflinger said, as you recall it?

MR. WALTER: Your Honor, again, I'm going to object for all the reasons in my grounds in the motion in limine under the present state of the record and the court file, the same, as shown.

THE COURT: Objection overruled to this question.

MR. KEITH: You may answer.

. . . .

THE WITNESS: Okay. Mr. Durflinger informed me that he had had a financial arrangement with Clark Yeager concerning cows and that he had not been able to come to an agreement as to the settlement of that, and that was basically it.

MR. KEITH: Was there any specific mentioning as to what he owed to him at that time?

MR. WALTER: Object to this, your Honor, as misstatement of the record. The witness hadn't testified that there was any money that Mr. Durflinger said was owed to anybody else, simply that there was an arrangement between Mr. Yeager and Mr. Durflinger. Mr. Keith's misstating the—

MR. KEITH: This witness earlier said a conversation in which he owed him money.

THE COURT: Gentlemen, stop the cross-table talk. Objection's overruled. There's a pending question. Answer it.

THE WITNESS: Would you repeat the question?

COURT REPORTER: Question "Was there any specific mentioning as to what he owed to him at that time?"

MR. BARNES: Just a minute. I would object for the further and additional reason it's into settlement discussions, and it's improper under the law.

THE COURT: Overruled.

MR. KEITH: You may answer.

THE WITNESS: Okay. To the best of my recollection, Mr. Durflinger indicated that they had an arrangement in which Clark Yeager was to winter the cows and that there was somewhat over two hundred cows, I believe, and that it was over some months. I can't remember, but I think it was something like $10 per month or $10 per cow, but I think it was $10 per month for each month that went by and/or the possibility of dividing the profit if these cows could be sold.

There was a certain purchase price. Then, you either guaranteed so much per month or portion of the profit if the cows made money, and that some form of disagreement arose, which I've assumed has led to this lawsuit, and that Mr. Durflinger informed me that he had tried to come to an arrangement or—not an arrangement, but an agreement—to wrap up this deal on these cows because the cows had been removed and they were gone.

I believe, to the best of my recollection, that the figures were in the neighborhood of say, $35,000, and Mr. Durflinger informed me that Mr. Yeager would like to have more than this but that he had tried to settle for somewhat less.

MR. BARNES: Just a moment. You're going right smack into settlement negotiations, and it's improper. It's improper whether we're talking about the parties themselves or letting them try to come in the back door to do it. And, frankly Defendant at this time moves for mistrial because of that, because of all the reasons set forth in our motion in limine.

THE COURT: Overruled.

◾ Evidence of offers to compromise or settlement negotiations is excluded in this state on the bases of relevancy and a public policy favoring settlements. *Lewis v. Kennison*, 278 N.W.2d 12, 14 (Iowa 1979). And the fact that such evidence is introduced through the testimony of a third person, not a participant in the transaction, makes no difference. It is still inadmissible. *Harrington v. Inhabitants of Lincoln*, 70 Mass. (4 Gray) 563, 567 (1856).

The difficulty here arises from the last few lines of Larsen's answer, beginning with the phrase "Mr. Durflinger informed me that he had tried to come to an arrangement . . . ." Prior to that, Larsen had

merely recited the provisions of the contract out of which the dispute arose. But in the final portion of his testimony he clearly made reference to a bargaining process which could only be an attempt at compromise.

It is important to understand precisely what the question is that confronts us. The objection which preceded Larsen's answer and was directed at the question asked by plaintiff's counsel was properly overruled because the question objected to did not call for a response referring to offers of compromise or settlement negotiations. That ruling is not in issue here. And the attack on the troublesome volunteered portion of Larsen's answer is limited to the contention that trial court abused its discretion in refusing to grant an extreme remedy: mistrial. There was no motion to strike the testimony or to admonish the jury to disregard it. See *Kaufman-Straus Co. v. Short,* 311 Ky. 78, 80, 223 S.W.2d 367, 368 (1949).

Trial courts are vested with broad discretion in determining whether to grant a mistrial. *State v. Blackwell,* 238 N.W.2d 131, 137–39 (Iowa 1976); see *Franklin v. Shelton,* 250 F.2d 92, 99 (10th Cir. 1957); cf. *Giltner v. Stark,* 219 N.W.2d 700, 711 (Iowa 1974) (refusal to grant mistrial due to misconduct by counsel); *Sandman v. Hagan,* 261 Iowa 560, 572, 154 N.W.2d 113, 120 (1967) (refusal to grant mistrial or new trial due to counsel's misconduct). *See generally* 5A *C.J.S. Appeal and Error* § 1611, at 116 (1958). Such discretion is a recognition of the trial court's better position to appraise the situation in the context of the full trial. *Blackwell,* 238 N.W.2d at 138; see *Franklin,* 250 F.2d at 99; *Baysinger v. Haney,* 261 Iowa 577, 581, 155 N.W.2d 496, 498 (1968).

If trial court had rejected a motion to strike the evidence complained of, that refusal would have been an abuse of discretion. We cannot say, however, that failure to grant a mistrial on the basis of this single incident in a trial which consumed nearly 400 transcript pages of testimony was such an abuse.

III. Defendant next complains because trial court submitted to the jury a claim for $2650 for expenses incurred in keeping the cattle after March 1. Defendant insists that the $2650 in question were expended by another person, David Denly, and that plaintiff thus cannot recover this amount because he has suffered no loss.

There was, as trial court noted in denying the motion for new trial, sufficient evidence to support a finding of fact by the jury that plaintiff was obligated to reimburse Denly for the expenditures represented by this $2650 claim. We are, then, bound by such a finding. Iowa R.App.P. 14(f)(1).

Because plaintiff was obligated to reimburse Denly, his recovery of this amount was proper. *See Varnham v. City of Council Bluffs,* 52 Iowa 698, 699, 3 N.W. 792, 793 (1879).

IV. Defendant next asserts that he was denied an opportunity to rehabilitate a witness, Caroll Dean Huffman, after plaintiff's cross-examination of that witness. Huffman's direct testimony dealt with the April 1974 condition of the cows which were the subject of the contract. On cross-examination, plaintiff's counsel established that the witness's last name was the same as defendant's wife's maiden name. He also elicited testimony that Huffman had come to the trial on prior days because he was also in the livestock business, he knew the parties, and he was interested in how the disagreement had come about. Huffman was asked if he had said, on the day before he testified, that he had no recollection of having visited plaintiff's farm until he had listened to the trial.

On redirect, Huffman testified that the closest he might be related to defendant's wife was as a fourth cousin. He also indicated that he had not talked to defendant's counsel until the day before he testified, that he had not wanted to testify, and that he had been subpoenaed. Defense counsel then asked, "Didn't you, in fact, tell me that you were afraid to testify against Clark Yeager for fear that he'd veto any loans that you might want to make at the Federal Land Bank?"

Plaintiff's objection was sustained, and the jury was instructed to disregard the question. Defendant made an offer of proof, during which Huffman indicated that

he was apprehensive about testifying because plaintiff, as a director of the Federal Land Bank, might veto Huffman's loan application.

After the offer, trial court again sustained plaintiff's objection because the proffered testimony would be prejudicial toward plaintiff. The court also noted that the witness had, in fact, testified and had been allowed, during redirect examination, to respond to plaintiff's attempts at impeachment.

The determination of whether to admit rehabilitative evidence is committed to trial court discretion. *Cf.* 4 J. Wigmore, *Evidence* § 1100 (J. Chadbourn rev. 1972) (relevance is one issue in determining admissibility of rehabilitative evidence); *Kalianov v. Darland,* 252 N.W.2d 732, 736 (Iowa 1977) (trial court has discretion to exclude evidence when its probative value is outweighed by, *inter alia,* danger of unfair prejudice). *See generally* 98 *C.J.S. Witnesses* § 648, at 670 (1957). Here, after plaintiff had attempted to impeach by showing bias, the witness was permitted to deny any bias and deny the facts upon which that bias might have been based. As trial court noted, the evidence which defendant sought to introduce was of limited probative value and was capable of causing prejudice against the plaintiff. *But see State v. Upton,* 167 N.W.2d 625, 629–30 (Iowa 1969). Exclusion of the evidence was not an abuse of discretion.

V. Defendant next attacks Instruction 6. He seems to raise two specific complaints. The first is that plaintiff should not have been allowed to recover on a showing that he substantially performed the contract. The second is that the instruction did not allow the jury to reduce the plaintiff's recovery by the amount of any damage which was done to defendant, unless defendant suffered greater damage than plaintiff.

We cannot conclude that defendant has preserved either of these arguments for review, however. The objection at trial that substantial performance was not the correct standard merely recited that the instruction "is not a proper statement of Iowa law." That objection preserves nothing. *See, e. g., Briney v. Tri-State Mutual Grain Dealers Fire Insurance Co.,* 254 Iowa 673, 689, 117 N.W.2d 889, 898 (1962).

Nor was there any objection which raised the question of how plaintiff's recovery should be reduced by defendant's damages with enough clarity to permit trial court to correct any error. *State v. Fisher,* 279 N.W.2d 265, 267 (Iowa 1979); *see Miller v. International Harvester Co.,* 246 N.W.2d 298, 301 (Iowa 1976). Defendant is therefore not entitled to review of either question.

VI. Finally, defendant accuses plaintiff's counsel of misconduct in closing argument. He claims that plaintiff's counsel indulged in personal ridicule of defense counsel, and he sets out excerpts from the final portion of plaintiff's rebuttal. No other portion of any of the closing arguments was reported.

Trial court has broad discretion in this area. Before a new trial will be granted, it must appear that prejudice resulted or that a different result could have been probable but for any misconduct. *Rasmussen v. Thilges,* 174 N.W.2d 384, 391 (Iowa 1970).

The comments made by plaintiff's counsel do not approach the cross-table sarcasm and ridicule found and criticized in *Maland v. Tesdall,* 232 Iowa 959, 966–67, 5 N.W.2d 327, 331 (1942). Plaintiff's counsel in the instant case was arguing that defense counsel had argued outside the record. The jury had sat through the trial and knew what was in the record. If plaintiff's counsel was correct, he should have had the opportunity to make the argument. If he was not, the jury was capable of making that determination. No prejudice has been shown, nor has a different result been shown as being likely. Trial court did not abuse its discretion in denying a new trial on this point.

AFFIRMED.