# IN THE SUPREME COURT OF IOWA

No. 21–1072

Submitted February 21, 2023—Filed June 9, 2023

**SHARI L. MARTIN,**

    Appellant,

vs.

**THOMAS A. TOVAR,** Individually and In His Official Capacity, and **CITY OF MUSCATINE, IOWA,**

    Appellees.

---

Appeal from the Iowa District Court for Muscatine County, Stuart P. Werling, Judge.

The plaintiff appeals the district court's grant of summary judgment in favor of the City of Muscatine on claims seeking to hold the City vicariously liable for a former police officer's sexual assault. **AFFIRMED.**

McDermott, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield, McDonald, and May, JJ., joined, and in which Oxley, J., joined as to part II, and concurred in judgment as to part I. Oxley, J., filed a special concurrence. Waterman, J., took no part in the consideration or decision of the case.

M. Leanne Tyler (argued) of Tyler & Associates, PC, Bettendorf, for appellant.

Brandon W. Lobberecht (argued) and Martha L. Shaff of Betty, Neuman & McMahon, P.L.C., Davenport, for appellees.

**McDERMOTT, Justice.**

While on patrol at around 2:00 a.m., an officer with the Muscatine Police Department initiated a traffic stop of a vehicle driven by David Faust. Another Muscatine police officer, Thomas Tovar, arrived separately and assisted at the scene. Faust was arrested on a charge of operating while intoxicated and transported to the police station.

Shari Martin was a passenger in Faust's vehicle. The officers observed that Martin was intoxicated, too, and thus unable to drive Faust's vehicle. In such a situation, it was the police department's common practice for an officer to give passengers who weren't under arrest a courtesy ride home. Adhering to that practice, Tovar drove Martin to a nearby hotel where she and Faust were staying that night. At the hotel, Tovar followed Martin to her room and raped her.

Tovar left the hotel after the sexual assault to respond to a domestic disturbance call elsewhere. After Faust was released from jail several hours later, he returned to the hotel room to find Martin naked and asleep on the bed. When Faust awakened her, Martin couldn't recall clear details of what had happened in the intervening hours, but had a fragmented memory of someone who might have been a police officer on top of her in the hotel room.

Faust called the Muscatine Police Department to report that Martin might have been sexually assaulted. The police lieutenant who answered Faust's call said he would come to the hotel to meet with them. An investigation, soon to be led by the Iowa Department of Investigation, had thus begun. Forensic analysis of the hotel room's bedding and Martin's clothing revealed Tovar's seminal fluid on both a bedsheet and Martin's jeans.

Investigators concluded that Tovar had attempted to conceal the sexual assault from other officers by turning off his body microphone, lying to the dispatcher that he was "cleared" from the hotel and available for another call while still in Martin's room, and responding to the domestic disturbance call on his police radio from the hotel room. When he drove to the scene of the domestic disturbance, he didn't activate his siren, emergency lights, or dashboard camera, all to avoid creating a recording that would show he was still at the hotel when he received the call. He lied to other officers afterward about where he'd been and what he'd been doing.

Tovar was criminally charged. A jury convicted him of third-degree sexual abuse of an incapacitated person under Iowa Code § 709.4(4) (2013). The Iowa Court of Appeals affirmed the conviction on appeal.

Martin sued Tovar and the City of Muscatine for civil damages, pleading causes of action for sexual assault, battery, intentional infliction of emotional distress, false imprisonment, and invasion of privacy. All the claims against the City were based on the doctrine of vicarious liability. The City moved for summary judgment on the claims against it. In granting the City's motion, the district court determined that Martin failed to prove that Tovar's sexual assault was within the scope of his employment and, thus, held that the City couldn't be held vicariously liable for the act. The district court also rejected Martin's request to extend liability to the City based on a theory of aided by agency. Martin appeals the district court's grant of summary judgment on these two issues.

**I. Vicarious Liability and Tovar's Scope of Employment.**

The doctrine of vicarious liability imposes liability against an employer for an employee's tortious conduct committed within the scope of employment. *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999). To come within the scope of employment, an employee's actions "must be of the same general nature as that authorized or incidental to the conduct authorized." *Id.* (quoting *Sandman v. Hagan*, 154 N.W.2d 113, 117 (Iowa 1967)). We will find an employee's conduct outside the scope of employment if it substantially diverges from conduct that the employer actually authorizes. *Id.* at 705–06. "Said another way, 'a deviation from the employer's business or interest to pursue the employee's own business or interest must be substantial in nature to relieve the employer from liability.' " *Id.* at 706 (emphasis omitted) (quoting *Sandman*, 154 N.W.2d at 118).

Whether an employee's act is within the scope of employment is ordinarily a jury question. *Id.* But when the undisputed material facts show that the employee's tortious conduct was not within the scope of employment, the issue is properly decided by the court on summary judgment. *Id.*

In *Godar v. Edwards*, a former student sued a school district and the district's curriculum director for claims based on the director's alleged sexual abuse of the student. *Id.* at 703–04. We affirmed dismissal of the student's vicarious liability claims against the school district, reasoning that although the director "had the opportunity to become acquainted with [the student] by virtue of his duties as curriculum director and programs he developed for children with spe-

cial needs, we believe it cannot be said that the actions were committed in furtherance of his duties as curriculum director or the objectives of any school district programs." *Id.* at 706–07.

In analyzing whether an employee's conduct is within the scope of employment, we have in the past looked to guidance from the Restatement of the Law of Agency—"agency" referring to the relationship between principals (such as employers) and agents (such as employees). *Godar*, 588 N.W.2d at 706. In *Godar*, for instance, we considered the scope-of-employment factors listed in the Restatement (Second) of Agency. *Godar*, 588 N.W.2d at 706 (citing Restatement (Second) of Agency § 229(2), at 506 (Am. L. Inst. (1958) [hereinafter Restatement (Second)]). But an updated edition—the Restatement (Third) of Agency—was released in 2006. Restatement (Third) of Agency (Am. L. Inst. (2006)) [hereinafter Restatement (Third)]. When a new version of a Restatement appears, we generally consider and cite it in our decisions. *Youngblut v. Youngblut*, 945 N.W.2d 25, 32–33 (Iowa 2020). We have cited the Restatement (Third) of Agency in prior cases. *See, e.g.*, *Slaughter v. Des Moines Univ. Coll. of Osteopathic Med.*, 925 N.W.2d 793, 803 (Iowa 2019).

In evaluating scope-of-employment questions, the Restatement (Third) instructs that "[a]n employee's act is not within the scope of employment when it occurs within an independent course of conduct not intended by the employee to serve any purpose of the employer." Restatement (Third) § 7.07(2), at 198. An "independent course of conduct," as that phrase is used, "represents a departure from, not an escalation of, conduct involved in performing assigned work or other conduct that an employer permits or controls." *Id.* § 707 cmt. *b.*, at 201.

Applying these principles to the facts of this case, Tovar's rape of Martin was an egregious departure from the authorized or assigned duties of his employment as a police officer. His criminal act was not intended to further any purpose or interest of the City; indeed, his crime was antithetical to it. Tovar knew that the act wasn't authorized or condoned, which is why he took steps to try to prevent the City from finding out about it. Tovar admitted, for instance, that he turned off the camera in his police car and turned off his body microphone, testifying that "I didn't want the police department to know what I was doing that I shouldn't have been."

Martin argues that we should find the sexual assault was within Tovar's scope of employment because it was foreseeable that he would misuse the instrumentality furnished by the City (namely, police authority) to take advantage of her. *See Doe v. Morris*, Civil Action No. 11–1532, 2013 WL 3933928, at *6 (E.D. La. July 30, 2013); *Cox v. Evansville Police Dep't*, 107 N.E.3d 453, 463–64 (Ind. 2018). In *Godar*, as Martin points out, we acknowledged that wrongful activities can be foreseeable. 588 N.W.2d at 708. But much like sexual abuse claims against the school district, we find no evidence that Tovar's sexual assault was the kind of act that "was expected, foreseeable, or sanctioned" by the City. *Id.* at 707.

Martin also flags a variety of performance problems that she argues the City ignored about Tovar's past conduct. She offers evidence of Tovar's poor performance evaluations, including evidence that at one point the police department demoted him from a detective position for misconduct. Although the considerable evidence that Martin presents convinces us that Tovar was a substandard

police officer, none offer clues that Tovar would *sexually assault* someone. His performance problems as an officer do not, without more, signal to the City that he was likely to perpetrate the appalling crime he committed.

Martin offers other evidence about Tovar that she argues creates foreseeability for the sexual assault, including a domestic abuse complaint from Tovar's live-in girlfriend (a complaint that the woman later dropped), a consensual romantic relationship that Tovar had with an assistant county attorney with whom he worked, and an affidavit from Martin's boyfriend from 2016 stating that he overheard a lieutenant with the Muscatine Police Department tell an investigator that other police officers knew about "prior complaints" involving sexual misconduct against Tovar. But on these items, too, we remain unconvinced that it was foreseeable that Tovar was likely to rape a citizen while on duty.

The only evidence Martin presents regarding sexual assault is an accusation from a woman who claimed that Tovar (several years *before* his rape of Martin) sexually assaulted her in the basement of the police station, while another police officer likely saw or heard it happen. As disturbing as this evidence may be, the problem with this argument is that the alleged victim of the assault didn't come forward until *after* Martin had already filed her civil lawsuit. Until that point, the alleged victim conceded that she had told only her boyfriend. The City thus could not have foreseen Tovar's sexual assault involving Martin based on information it didn't possess until years after Martin's assault.

Courts must tread carefully when considering foreseeability in a scope-of-employment analysis. The Restatement (Third) describes the mistaken tendency "to conflate the foreseeable likelihood, from an employer's standpoint,

that mishaps and slippage will occur . . . with the possibility that the work may lead to or somehow provide the occasion for intentional misconduct that is distinct from an employee's actions in performing assigned work." Restatement (Third) § 7.07, cmt. *b.*, at 202. Of course, distinct intentional misconduct "is indeed always 'foreseeable,' given human frailty, but its occurrence is not a risk that an employer can effectively control and its occurrence may be related causally to employment no more than to other relationships and circumstances in an errant employee's life more generally." *Id.* at 202–03. In this case, we find no basis to impose vicarious liability against the City based on foreseeability.

The Restatement (Third) summarizes the rationale for rejecting vicarious liability claims against an employer in this situation:

> When an employee commits a tort with the sole intention of furthering the employee's own purposes, and not any purpose of the employer, it is neither fair nor true-to-life to characterize the employee's action as that of a representative of the employer. The employee's intention severs the basis for treating the employee's act as that of the employer in the employee's interaction with the third party.

*Id.* at 201; *see also Godar*, 588 N.W.2d at 707.

Tovar's rape of Martin was, in our view, an act so unusual or startling under the circumstances, and such a departure from the officer's duty simply to provide an intoxicated passenger a courtesy ride home, that it falls outside the scope of his employment. The sexual assault furthered only Tovar's deviant, felonious interest, and furthered no purpose or aim of the City. We thus find no error in the district court's determination that Tovar's sexual assault fell outside his scope of employment.

**II. Liability Based on Martin's Proposed Aided-by-Agency Theory.**

Martin argues in the alternative that, even if we find that Tovar was acting outside the scope of employment, vicarious liability should apply against the City under an "aided by agency" theory. The aided-by-agency theory, which appears in section 219 of the Restatement (Second), is an exception to the usual rule that an employer may be vicariously liable only when an employee's tort occurs within the scope of employment. *See* Restatement (Second) § 219, at 481. Under this exception, an employer may be vicariously liable for an employee's tortious conduct if the employee "was aided in accomplishing the tort by the existence of the agency relationship." *Id.* Applying the theory here, Martin argues that the City should be held vicariously liable because Tovar's position as a police officer—conferred on him by the City—facilitated the rape.

Martin concedes that Iowa has never actually recognized such a broad aided-by-agency theory. But she points to our decision in *Haskenhoff v. Homeland Energy Solutions, LLC* as a step already taken toward recognizing one. 897 N.W.2d 553 (2017). *Haskenhoff* involved a hostile-work-environment claim under the Iowa Civil Rights Act, Iowa Code ch. 216. *Haskenhoff*, 897 N.W.2d at 571–72. Our analysis in *Haskenfoff* included a discussion of two United States Supreme Court cases: *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 759 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). *Haskenhoff*, 897 N.W.2d at 566–67, 572–75. The Supreme Court in those two cases, citing section 219(2)(d) of the Restatement (Second), applied a limited form of aided-by-agency liability to supervisors' acts against subordinates. *Burlington*, 524 U.S. at 758–59; *Faragher*, 524 U.S. at 793–809. We noted in *Haskenhoff*

that Iowa had previously adopted, consistent with *Burlington* and *Faragher*, vicarious liability for employers for hostile-work-environment claims under the Iowa Civil Rights Act. *Haskenhoff*, 897 N.W.2d at 573.

But our narrow application of an aided-by-agency theory to hostile-work-environment claims brought under the Iowa Civil Rights Act doesn't translate to the circumstances of this case. The Supreme Court in *Burlington* and *Faragher* did *not* adopt the Restatement (Second)'s aided-by-agency theory wholesale, but instead limited it to fit within Title VII of the Federal Civil Rights Act. *See Burlington*, 524 U.S. at 754–55; *Faragher*, 524 U.S at 802. What's more, our focus in *Haskenhoff* wasn't on the contours of the aided-by-agency theory. *See* 897 N.W.2d at 570–75. The issue presented was whether an employer could be held both directly liable (based on the employer's own negligence) *and* vicariously liable (based on misconduct by one of its supervisors) for a hostile-work-environment claim under the Iowa Civil Rights Act. *Id.* Our conclusion to that part of the opinion resolved only that narrow question: "We conclude the vicarious liability theory was intended to supplement, not replace, the direct negligence theory for supervisor harassment." *Id.* at 574. We have never, in *Haskenhoff* or any other case, extended the aided-by-agency theory to another tort. *Haskenhoff*, in short, supplies almost no propulsive force in the direction of adopting the broad aided-by-agency theory that Martin seeks.

Martin also cites several cases from around the country that have applied an aided-by-agency theory to hold governmental bodies vicariously liable for intentional torts committed by law enforcement officers. *See, e.g., Peña v. Greffet*, 110 F. Supp. 3d 1103, 1134 (D.N.M. 2015); *Sherman v. State Dep't of Pub. Safety*,

190 A.3d 148, 179 (Del. 2018); *Doe v. Forrest*, 853 A.2d 48, 67 (Vt. 2004). The courts in these cases unvaryingly expressed a public policy in favor of holding governmental bodies liable for police misconduct based on the unique power that law enforcement officers wield over citizens.

As a policy matter, our general assembly has spoken on the breadth of municipality liability for the acts of its employees. *See* Iowa Code § 670.2(1) (2015). The Iowa Municipal Tort Claims Act allows a municipality to be held liable for torts committed by "its officers and employees, *acting within the scope of their employment or duties.*" *Id.* (emphasis added). Where the policy-making body of our government has limited vicarious liability of municipalities to torts committed while "acting within the scope of their employment or duties," *id.*, we are hesitant to follow these courts' leads under a broad reading of the aided-by-agency theory.

Other courts have rejected attempts to apply a broad aided-by-agency theory in cases not limited to law enforcement officers but alleging a wide variety of claims. *See, e.g., Miles v. Simmons Univ.*, 514 F. Supp. 3d 1070, 1077–79 (D. Minn. 2021) (predicting Minnesota law and noting that Minnesota courts have only recognized aided-by-agency in the context of supervisor hostile-work-environment claims); *Pearce v. Werner Enters., Inc.*, 116 F. Supp. 3d 948, 955–57 (D. Neb. 2015) (predicting that Nebraska would not adopt the Restatement (Second)'s aided-by-agency exception to expand liability for torts committed outside the scope of employment); *Mahar v. StoneWood Transp.*, 823 A.2d 540, 546 (Maine 2003); *Zsigo v. Hurley Med. Ctr.*, 716 N.W.2d 220, 230–31 (Mich. 2006); *Groob v. KeyBank*, 843 N.E.2d 1170, 1179–80 (Ohio 2006).

We find the reasoning rejecting a broader aided-by-agency theory more persuasive. One federal court (predicting that its own state court would find vicarious liability against an officer) described "the obvious defect in the aided-in-agency theory" this way: "[I]t comes close to creating strict vicarious liability for employers, and, despite purporting to be an exception, it nearly swallows the general rule that respondeat superior does not attach to intentional torts." *Peña*, 110 F. Supp. 3d at 1118. Expressing a similar view, the Michigan Supreme Court warned that aided-by-agency liability "would expose employers to the 'threat of vicarious liability that knows no borders' for acts committed by employees that are clearly outside the scope of employment" and would pose "the danger of adopting an exception that essentially has no parameters." *Zsigo*, 716 N.W.2d at 229 (quoting *Doe*, 853 A.2d at 70 (Skoglund, J., dissenting)).

An argument can almost always be made at *some* level of generality that an employee's tortious conduct was "aided" by the employee's job. As one court illustrated the theory's shortcomings, under the language of section 219(2)(d) of the Restatement (Second):

> [A] creative plaintiff's lawyer could make a colorable argument for vicarious liability in almost every intentional tort case in which the tortfeasor happens to be gainfully employed. If a barista poisoned a patron's coffee, the patron could sue the coffee shop under the theory that the barista was only able to commit the tort because he or she worked for the coffee shop. If a utility worker used his uniform and credentials to get invited into a woman's home, and then proceeded to sexually assault the woman, the utility worker's agency relationship with the utility company could be said to have aided him in his sexual assault. If a drive-by shooting was committed using a company car or a police department—or security company-issued gun, then the plaintiff could name the issuing employer.

*Peña*, 110 F. Supp. 3d at 1118. Indeed, the same argument that Martin makes about the aided-by-agency theory would have applied equally in *Godar*, for instance, in that the curriculum director could be said to have been "aided" in abusing the student because of his employment with the school district.

Notably, the drafters of the Restatement (Third) completely abandoned the section 219(2)(d) aided-by-agency theory when they updated the Restatement (Second). *Compare* Restatement (Third) § 707, at 198, *with* Restatement (Second) § 219(2)(d), at 481. The Restatement (Third) approves vicarious liability only for conduct committed by an agent acting within the scope of employment, or when actions taken by an agent acting with apparent authority constitute a tort or enable the agent to conceal its commission. *See* Restatement (Third) § 7.03, cmt. *b.*, at 198–203. (Martin, for her part, doesn't argue that the City is liable under any "apparent authority" theory.) Indeed, the Restatement (Second) itself now includes a note that disavows the aided-by-agency theory, stating:

> The second part of § 219(2)(d), regarding the "aided-by-agency" theory of vicarious liability, was not approved by the ALI [American Law Institute] membership and thus did not represent the position of the ALI. It has since been superseded by the Restatement of the Law Third, Agency; *see* Restatement of the Law Third, Agency § 7.08, Comment *b* . . . .

Restatement (Second) of Agency § 219, note, at 174 (Supp. 2023) (emphasis omitted). Shunned even by the organization that originated the theory, the aided-by-agency theory does not appear ripe for any expansion.

We decline to adopt Martin's proposed aided-by-agency theory to impose vicarious liability on the City.

**III. Conclusion.**

The district court correctly granted summary judgment in the City's favor. We thus affirm the judgment dismissing the claims against the City.

**AFFIRMED.**

Christensen, C.J., and Mansfield, McDonald, and May, JJ., join this opinion, and Oxely, J., joins as to part II of this opinion, and concurs in judgment as to part I of this opinion. Oxley, J., files an opinion concurring specially. Waterman, J., takes no part.

**OXLEY, Justice (concurring specially).**

I agree with the majority's rejection of the aided-by-agency theory of liability, which is an exception to the general rule that an employer is only vicariously liable for its employee's torts committed within the scope of employment. As the majority recognizes, by statute a city is only "subject to liability" for the torts "of its officers and employees, acting within the scope of their employment or duties." Iowa Code § 670.2 (2015). Therefore, I join part II of the majority opinion.

I also agree with the court's conclusion that, on the facts presented in the summary judgment record, Shari Martin failed to establish that Thomas Tovar was acting within the scope of his employment. The record establishes only that Tovar's position as a police officer gave him the opportunity to sexually assault Martin when he gave her a ride to her hotel after David Faust (the driver of the vehicle Martin was in when police stopped them) was arrested and she was too intoxicated to drive herself, bringing this case within our holding in *Godar v. Edwards*, 588 N.W.2d 701, 706–07 (Iowa 1999) (holding that having the opportunity to become acquainted with students as the curriculum director did not bring the director's conduct of sexually assaulting a student on and off school premises within the scope of his employment).

I write separately to note what we are <u>not</u> deciding in this case. There are no allegations that Tovar used his authority as a police officer to coerce Martin into having sex with him as a quid pro quo for him not arresting or detaining her. Whether those actions would be in furtherance of his duties as a police officer likely falls to a jury to decide. *See, e.g.*, *L.B. v. United States*, 515 P.3d 818,

825 (Mont. 2022) ("[I]f an on-duty police officer obtains consent by misusing official authority, the wrongful act may be within the scope of employment if it arose out of the employment and was at least partially motivated by an intent or purpose to serve the interests of his employer."); *id.* at 828 ("We conclude that whether Officer Bullcoming acted outside the scope of his employment when he used that employment as a vehicle to obtain L.B.'s consent to sexual intercourse [by promising not to arrest her] must be answered by the trier of fact, with the guidance of the principles set forth herein."); *see also Cox v. Evansville Police Dep't,* 107 N.E.3d 453, 463 (Ind. 2018) ("[I]f an on-duty police officer commits a sexual assault by misusing official authority, the sexual assault is within the scope of employment if the employment context naturally or predictably gave rise to that abuse of official authority."); *id.* at 464 (finding a fact issue as to whether an officer was acting in the scope of his employment where "[a]s part of his employment duties, Officer Rogers was alone with Beyer, handcuffed her, and took her to the lock-up facility and to the hospital. During those times and as part of his employment activities, Officer Rogers exercised physical control and official authority over Beyer. That physical control continued as he again placed her in handcuffs, loosened them, fondled her breast, took her from the hospital to a dark wooded area, walked her to a bench, raped her, placed her in a crime scene van, and took her home."). At a minimum, that scenario is for another day.

With this understanding, I concur in the judgment of the court with respect to part I.